# EXHIBIT A

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 2                     HARRISBURG DIVISION

 3  UNITED STATES OF AMERICA,        ) CASE NO.
                 Plaintiff           ) 1:21-MJ-00088-MCC
 4          vs.                      )
    MARSHALL NEEFE,                  )
 5              Defendant            )
    _____)

 6

 7              TRANSCRIPT OF DETENTION HEARING
         BEFORE THE HONORABLE MARTIN C. CARLSON
 8           UNITED STATES MAGISTRATE JUDGE
             14 SEPTEMBER 2021 - 4:05 P.M.

 9

10  APPEARANCES:

11  For the Government:

12      Michael A. Consiglio, Esq., AUSA
        U.S. Attorney's Office
13      Federal Building, 2nd Floor
        228 Walnut Street
14      Harrisburg, PA 17108
        (717) 221-4482

15

16  For the Defendant:

17      Melissa B. Porter, Esq., AFPD
        Federal Public Defender's Office
18      100 Chestnut Street, Suite 306
        Harrisburg, PA 17101
19      (717) 782-2237

20  Transcriber:

21      Wesley J. Armstrong, RMR
        Official Court Reporter
22      U.S. Courthouse & Federal Building
        228 Walnut Street
23      Harrisburg, PA 17101
        (717) 542-5569

24

25      Proceedings recorded by digital audio recording; transcript
    produced by off-line computer aided transcription.
```

U.S. District Court, Middle District of PA

**P R O C E E D I N G S**

1                             

2        THE COURT: Good afternoon, Mr. Consiglio.

3        MR. CONSIGLIO: Good afternoon, Your Honor.

4        THE COURT: Good afternoon, Ms. Porter.

5        MS. PORTER: Good afternoon, Your Honor.

6        THE COURT: Good afternoon.  It is Mr. Neefe?

7        THE DEFENDANT: Yes, Your Honor.

8        THE COURT: You'll forgive me, Mr. Neefe, I was having

9 a hard time hearing you when we were in a virtual session.  I

10 wanted to make sure I was correctly pronouncing your name. So

11 this is the continuation of proceedings in this case of United

12 States of America vs. Marshall Neefe, and it is this Court's

13 number 21-MJ-88.

14        I had a chance to speak with you yesterday, sir,

15 advising you of the penalties for the charges brought against

16 you in the fifteen count indictment returned by the grand jury.

17 I also had the opportunity to remind you of the rights you had

18 as an American citizen under our Constitution and took steps to

19 protect those rights by appointing Ms. Porter to represent you.

20        This is now the time and place for a consideration of

21 the government's request that you be detained pending further

22 proceedings in this District of Columbia.  Is the government

23 prepared to proceed with its detention hearing in this matter?

24        MR. CONSIGLIO: Yes, Your Honor.

25        THE COURT: Then, Mr. Consiglio, you may proceed.

1  What do you wish to present by way of testimony, proffer, or by

2  in any other means regarding your request for detention?

3           MR. CONSIGLIO: Your Honor, we'd like to proceed by

4  way of proffer if we could. With the Court's permission I'll --

5           THE COURT: Oh, certainly. And let me ask those who

6  are around Mr. Consiglio, is there any concern with him

7  removing his mask for the purpose of addressing me?

8           MS. PORTER: No.

9           THE COURT: Seeing no objection, you may do so.

10 Understand, of course, Ms. Porter will be afforded the same

11 privilege.

12          MR. CONSIGLIO: Yes, Your Honor.

13          THE COURT: Very well.

14          MR. CONSIGLIO: Your Honor, we ask for the Court to

15 detain Mr. Neefe for a variety of reasons, and we'll start

16 first with the basic circumstances of this case.  A grand jury

17 has returned an indictment finding probable cause that the

18 defendant has engaged in a series of crimes, and some of those

19 crimes are crimes of violence, and those crimes of violence

20 authorize detention under certain circumstances.

21          The crimes of violence that I think are most

22 appropriate for this Court's consideration are the charges at

23 Count 4 dealing with assault on a federal officer and the

24 charge at Count 10, which is that charge at Count 10 deals with

25 the large metal sign that was used in the breach of the United

1   States Capitol, as well as Counts 5 and 7, which are felonies.

2   Though not crimes of violence, they do involve a dangerous

3   weapon.

4           The instruments involved in that are particularly the

5   wooden club referenced in the speaking indictment that's

6   involved in this case, and the facts of the crime are very

7   clear to the Court from the speaking indictment.  So I'm not

8   going to belabor those facts for the Court.

9           Just in brief summarization, this defendant was

10  involved, as found by the grand jury and essentially confessed

11  to by the defendant after he was arrested and interviewed to

12  his involvement in the breach of the United States Capitol on

13  January 6th, and it was a violent act with the use of weapons

14  which caused and which resulted in substantial harm to law

15  enforcement officers of the United States who were attempting

16  to defend the Capitol, damage to property of the United States,

17  and most significantly the attempted disruption of one of our

18  most sacred proceedings as a republic.

19          The defendant's involvement in this case was more

20  than as a spectator.  He was an active participant, an active

21  participant and a violent participant.  As described in the

22  speaking indictment, the defendant was one of the individuals

23  who held a large metal framed sign that was essentially used as

24  a wedge and as a means of pushing a line of law enforcement

25  back so that they could break the line of law enforcement and

1   force their way into the Capitol, which was successful in these

2   circumstances, and this defendant did make it into the Capitol.

3           Unlike other individuals who were involved in this

4   circumstance he made his way into the United States Capitol

5   with a weapon beyond the sign.  This weapon was a homemade club

6   that he had fashioned in anticipation of these riotous acts.

7   What we ask the Court to consider when deciding whether

8   detention is appropriate for this defendant is to focus on a

9   couple of circumstances which are important when deciding

10  whether detention is appropriate in this case.  And, Your

11  Honor, I'm going to highlight certain facts by way of proffer

12  for the Court and build off of them for an argument for

13  detention later if that's appropriate.

14          THE COURT: Certainly.

15          MR. CONSIGLIO: But I'd ask the Court to consider a

16  certain set of facts.  One, that the defendant's conduct in

17  this case, as the evidence shows in this case, was not a

18  momentary lapse of judgment.  This was a clearly planned course

19  of conduct.  Federal authorities investigating this matter

20  found communications involving the defendant and the

21  defendant's communications with others in public media postings

22  where his involvement in planning to engage in this type of

23  conduct began right around Election Day, that if the election

24  did not go as he wanted it to go he was ready to take acts of

25  violence to ensure that this would occur, and specifically

1  speaking with certain codefendants in this case, discussing not

2  in an offhand manner, but in clear deliberation of coming over

3  and meeting, strategizing and planning how this would occur and

4  how this would be accomplished.

5          In addition, this communication not only involved the

6  planning as early as the first week of November 2020, but that

7  the communications and the plans went on in a very deliberate

8  fashion for the weeks thereafter, including, as referenced

9  earlier, making plans to build a club, design a club, engrave

10 it as he did, but also plans and discussions about other

11 weapons that could be used or would be used in accessing the

12 Capitol in this case, weapons such as Mr. Smith's knife, which

13 a grand jury found probable cause he brought to the scene and

14 was possessed related to these riotous actions.

15         In addition, Your Honor, another fact that this Court

16 should consider, and I'm offering it by way of proffer, and I

17 believe some portions of this are reflected in the speaking

18 indictment, indicate that this defendant, when at the scene of

19 the events and involved in the activities, was a willing and

20 violent participant in them.

21         There's no real sign of second guessing. There's no

22 sign or indication during the course of the events of the

23 wrongfulness, the criminality, the perhaps crossing a line that

24 is somehow improper.  In fact, the communications as reflected

25 indicate a happy willingness to be a part of his moment in

1 history, his violent moment in history.  In addition, Your

2 Honor, following the event, when perhaps reason, when perhaps a

3 more thoughtful approach to what had occurred is presented in

4 these communications that he had with those of like minded

5 thought, as well as participants, his communications are

6 similar ilk.

7          In fact, his communications are of the lines, "Next

8 time I'm bringing a gun.  Next time it's going to be more

9 violent.  It's going to be more catastrophic than what already

10 occurred."  And it's with that circumstance and that concern

11 that this Court first begins its analysis and must consider

12 whether this crime in itself is worthy of detention and whether

13 this defendant poses a risk to the public and a risk to not

14 appear in the future under these circumstances.

15          I would note for the Court a couple of other things,

16 facts for this Court's consideration. Analysis of his social

17 media communications as well as his admission and as well as

18 his communications in the presentence investigation report

19 reveals that the defendant has access to firearms.  There is

20 multiple communications in November as well as communications

21 in December with friends and like minded individuals, and like

22 minded being like minded insurrectionists of his access to

23 ammunition, his access to an AR-15 which he had described that

24 he had broken down and had rebuilt into an AR-10, as well as

25 his access to another firearm, as well as taking weapons and

1   perhaps upon firing weapons, but also discussing with others

2   ammunition and trading of ammunition, sale of ammunition.

3            I would also note for the Court that this access and

4   control over firearms is also reflected in the pretrial

5   services investigation report where the defendant does

6   acknowledge two firearms.  One he describes a nine millimeter

7   handgun, and he also describes an Armalite rifle AR-10.  He

8   further describes that his fiancee, which I believe that he

9   also describes as a person who he lives with, possesses a Smith

10  & Wesson .380 caliber handgun, and his other roommate, a David

11  Templey, owns seven firearms, which are also kept at this

12  residence.

13           The reason I highlight the firearms accessible to

14  those who are associated with him is the control this Court

15  would have over him and his life and his living circumstances

16  would be, this Court would not have the same degree of control

17  over the friends, family, and associates of this defendant, all

18  of which -- not all of which, many of which appear to have

19  access to firearms in their residences where they live.

20           Another fact I would ask the Court to consider in its

21  determination of detention is the defendant's history with

22  controlled substances.  In the pretrial services report there

23  is an indication that the defendant noted to the pretrial

24  services officer his more recent usage of substances,

25  particularly perhaps monthly use of alcohol and occasional use

1  of amphetamines, which is the nine years ago marijuana weekly,

2  and most recent usage being perhaps two weeks ago, and then

3  prescription opiates occasionally, but he's saying his last

4  usage was approximately ten years ago.

5       I would highlight this for the Court for a couple of

6  reasons.  Amphetamines, occasional use, but saying the most

7  recent usage was nine years ago, and marijuana as relatively

8  frequent usage he describes, and the occasional opiates is not

9  consistent with the United States investigation into his drug

10  use.

11       With respect to the marijuana usage, that is

12  consistent.  There appears to be very regular communication, at

13  least in the months going back before January 6th, 2018, of the

14  defendant's marijuana usage in different forms, vaping it and

15  smoking marijuana generally. There's also some discussion

16  involving his codefendant Mr. Smith and the use of cocaine,

17  although that's less clear about Mr. Neefe's involvement in

18  cocaine, but there is also an indication in the Facebook

19  messaging and postings with his colleagues of the defendant's

20  use of LSD and the purchasing of hits of LSD and a selfie shot

21  of him with a patch of LSD on his tongue, and I believe that is

22  late December of 2020.

23       So relatively recent, and this is just from the

24  federal examination of his Facebook records and materials for

25  essentially a two month time period from November through

1   January of this year.  So it is noteworthy for a couple of

2   reasons. LSD usage is of the highest degree of concern for

3   individuals, the effects it can have on individuals and how

4   they can be responsive.  Second, it speaks to the candor in

5   which information was shared with the probation officer doing a

6   presentence investigation report deciding whether freedom

7   should be given or not and recommendations along those lines to

8   this Court and it not being disclosed.

9          I would also note for the Court a couple of other

10  factors that were revealed in the presentence or revealed in

11  the federal investigation, which are considerations this Court

12  should take in deciding whether release is appropriate.  Your

13  Honor, there is extensive communications of his association

14  with extremist views and violent rhetoric, violent rhetoric of

15  the highest order and of affinity towards and agreement with

16  some of the worst in human history.

17         I will not belabor the points with the Court, but it

18  is safe to represent to this Court that there are multiple

19  communications involving Mr. Neefe and Mr. Smith where the

20  communications between the two and where Mr. Neefe is

21  acquiescing or joining in some of the communications, speaking

22  of in terms supporting Nazism, extremist views of national

23  socialism, the appropriateness of their cause and of their

24  action, and of their work in what they had accomplished in

25  their past with the country of Germany.

1          In a similar vein there is repeated discussion and

2    references by Mr. Neefe, as well as joined in by others,

3    speaking in antisemitic terms, antisemitic terms associated

4    specifically with the January 6th events, the Jewish problem,

5    the Jewish association with the events that are taking place,

6    and appropriate violent recourse which should be taken in

7    response to what is happening as a result of this circumstance.

8          And of similar vein is racist communication, racist

9    communication again identifying minority groups, particularly

10   African Americans, and what is appropriate conduct which should

11   be taken towards those individuals, with crass language and the

12   most vulgar of language utilized by this defendant, joined in

13   by this defendant and his codefendant, including references to,

14   you know, the particular events of our more recent past.

15          I believe there is a reference with Mr. Neefe

16   describing dragging somebody by a truck by a rope or a chain as

17   the best way to get them up a hill, communications of that ilk.

18   What we respectfully ask the Court to do is to consider the

19   speaking indictment, consider some, consider the

20   representations the government has made regarding the

21   defendant's communications, and have this defendant detained

22   under these circumstances.

23          Your Honor, I could go on for a very long time line

24   by line, communication by communication related to some of

25   this, and I could use the most explicit of language that was

1  utilized by this defendant.  Having had experience with this

2  Court I'm not sure whether that is going to advance the cause

3  any further than the representations that this is the

4  communications and this is the poisoned mind that engaged in

5  these communications and said these things to counterparts.

6  This is the person we are dealing with, Your Honor, and we will

7  hold back further argument until I believe there might be

8  further presentation of a third party custodian.

9          THE COURT: Very well.  Thank you.  Thank you,

10 Mr. Consiglio.  Ms. Porter, Mr. Consiglio has gone beyond the

11 indictment itself proving some other matters. Did you need a

12 moment or two to address any of those matters with either your

13 third party custodian or with Mr. Neefe?

14         MS. PORTER: No, Your Honor, I don't.

15         THE COURT: Very well. Then I've heard from

16 Mr. Consiglio.  What by way of proffer or witness presentation

17 would you like to make?

18         MS. PORTER: Your Honor, I think first I'd like to

19 address some of what AUSA Consiglio just presented outside of

20 the indictment. Obviously in considering whether or not to

21 detain Mr. Neefe, the strength of the evidence as well as the

22 nature and circumstances of the crime are things that Your

23 Honor is permitted to take into consideration.

24         However, this is not a presumption case, so we need

25 to focus on the fact that the decision that needs to be made

1  today is whether there are conditions or any sets of conditions

2  that can be placed upon Mr. Neefe to ensure that he is neither

3  a flight risk nor a danger to the community or anyone else.  As

4  to the drug use, I would like to point out to the fact that it

5  would appear a lot of as to the prescription opiates, that was

6  about ten years ago according to Mr. Neefe.

7       Admittedly he did tell Probation that he did struggle

8  with depression and suicidal ideations and things of that

9  nature about ten years ago.  He was treated for that and he

10 states that he doesn't have any issues with that to this day.

11 So I don't think it's fair to judge a twenty-five year old man

12 based on something that he may or may not have done at the age

13 of fifteen.

14       THE COURT: As I understood Mr. Consiglio's point, I

15 agree with you that we would not judge Mr. Neefe based on what

16 appears to have been an alleged drug overdose at a time of

17 depression and when he may have been seeking self harm. I had

18 understood Mr. Consiglio's point to be something slightly

19 different that the drug use disclosed is incomplete and

20 inaccurate in that there is evidence of current polysubstance

21 drug use in the Facebook postings.

22       MS. PORTER: Understood, Your Honor.

23       THE COURT: Very well.

24       MS. PORTER: Understanding that there was

25 communications I believe and Facebook messages from December of

1   last year indicating that on an occasion or perhaps occasions

2   he had used LSD, I would assume that with Mr. Neefe's openness

3   with everything else it doesn't seem like it would be

4   beneficial to hide that incident.

5         So I guess at this point without other evidence we'll

6   give him the benefit of the doubt and assume that that's not an

7   intentional thing that he kept from probation in light of all

8   the things that he was open with them about.  The AUSA stated

9   that he gave some sort of confession.  While I wasn't there for

10  that and won't harp on the constitutionality or voluntariness

11  of that confession, I would say that up until this point he has

12  been honest with everything, everyone that he spoke to about

13  this since his arrest yesterday, so it doesn't seem like

14  keeping that one piece of information would have been

15  intentional nor beneficial on his behalf.

16        And in addition the communications between Mr. Neefe

17  and Mr. Smith, I don't see the point of bringing that up.

18  Mr. Smith was here yesterday.  It sounds like he was involved

19  in that conversation. He was released on conditions and none of

20  that was brought up.  So I do think it's unfair to then put

21  that two way conversation all on Mr. Neefe at this point, but

22  again I point to the fact that we are here today to determine

23  what conditions, if any, can be set for Mr. Neefe.  I will note

24  that Probation in its report recommended that Mr. Neefe be

25  released with an appropriate third party custodian.  So at this

```
 1  time we will present our third party custodian, who is his
 2  mother Julie Neefe.
 3          (Julie Ann Neefe was called to testify and was sworn
 4  by the courtroom deputy.)
 5          COURTROOM DEPUTY: State your full name for the record
 6  and spell your last name.
 7          THE WITNESS: Julie Ann Neefe. It's N-E-E-F-E.
 8          DIRECT EXAMINATION BY MS. PORTER:
 9  Q.  Ms. Neefe, can you hear me okay?
10  A.  Yes, that's better.
11          MS. PORTER: Is it okay if I remove my mask, Your
12  Honor?
13          THE COURT: Oh, certainly.
14          MS. PORTER: Thank you.
15          BY MS. PORTER:
16  Q.  All right, Ms. Neefe, you stated that you are Mr. Neefe's
17  mother, correct?
18  A.  Yes.
19  Q.  And what do you do for a living?
20  A.  I am an insurance biller for Casses Chiropractic Clinic
21  in Carlisle.
22  Q.  And how long have you been in that position?
23  A.  Fourteen years.
24  Q.  Okay.  And what are your hours like?
25  A.  I work from 7:00 to 4:00 Monday through Friday.
```

1  **Q.**   And is that in the office?

2  **A.**   Yes.  Uh-huh.

3  **Q.**   And is that a full-time position then?

4  **A.**   Yes.

5  **Q.**   Okay.  Who do you live with?

6  **A.**   I live with my husband James and my youngest son Cody.

7  **Q.**   How old is Cody?

8  **A.**   Cody is going to be twenty-one in a few weeks.

9  **Q.**   Okay.  Does Marshall currently stay with you?

10  **A.**   No, he does not.

11  **Q.**   Okay.  And where had he been staying prior to today?

12  **A.**   With his fiancee.

13  **Q.**   What is his fiance's name?

14  **A.**   Victoria Dumont.

15  **Q.**   What is your relationship like with her?

16  **A.**   We don't see each other a lot, you know, with her working

17  and my working, you know.  Of course I see my grandson and, you

18  know, they're busy and have a lot of animals to take care of,

19  so yeah.

20  **Q.**   Okay. How old is your grandson?

21  **A.**   Three and a half.

22  **Q.**   Okay.  And what is your relationship like with Marshall?

23  **A.**   Great. Marshall is, has never given us any trouble.  He's

24  been a great child and he's never shown any acts of violence.

25  He's, he's always been sweet and courteous and compassionate,

1  the boy that I raised.

2  **Q.**   Okay.  And how long has he been out of the house?

3  **A.**   Since he's been eighteen.

4  **Q.**   Okay.  And how old is he now?

5  **A.**   Twenty-five.

6  **Q.**   And would you be comfortable with him returning home at

7  this point?

8  **A.**   Absolutely.

9  **Q.**   Okay. Would he have a room to sleep in?

10  **A.**   Yep, yep, his own room.

11  **Q.**   Okay. Did you say that would be his own room?

12  **A.**   Yes, yes.

13  **Q.**   And what does your husband do for a living?

14  **A.**   He's a general contractor, residential building, self

15  employed.

16  **Q.**   Okay.  And your son Cody, what does he do for a living?

17  **A.**   He works for Tulpehocken's Water Distribution.

18  **Q.**   Okay.  Are you aware of the charges that Mr. Neefe is

19  charged with?

20  **A.**   Yes.

21  **Q.**   Have you had a chance to take a look at the indictment?

22  **A.**   Yes, I went over that last night.

23  **Q.**   And you were obviously here for the prosecutor's summary

24  of their evidence at this point?

25  **A.**   Yes.

1 **Q.** Okay. Does any of that information change your decision

2 to be, to allow Mr. Neefe to come back home and stay with you?

3 **A.** Absolutely not.

4 **Q.** Okay. Now, we had talked a little bit about Mr. Neefe's

5 mental health history, the issues that he would have had when

6 he was about fifteen and maybe a few years ago back in 2016.

7 Do you believe that anything that took place back then

8 continues to be an issue with him --

9 **A.** No.

10 **Q.** -- for him today?

11 **A.** No.

12 **Q.** Okay. Do you believe that that prevents him from

13 understanding what he needs to do moving forward?

14 **A.** No.

15 **Q.** Okay. And do you feel comfortable subjecting your home to

16 possible searches by the pretrial officers if they need to come

17 in and do that?

18 **A.** That's fine.

19 **Q.** Do you have any weapons in your home?

20 **A.** Yes, we do.

21 **Q.** Okay. Would you be willing to get rid of those so

22 Mr. Neefe can come home?

23 **A.** Yes.

24 **Q.** Okay. And do you know off of the top of your head how

25 many firearms you might have at this point?

**A.**   Two pistols, and then my husband is, you know, duck
hunting and -- he doesn't do hunting much anymore, but, you
know, so he has different types of rifles for, just for
hunting.

**Q.**   Okay.  And you'd be able to get rid of those relatively
quickly?

**A.**   Yes.

**Q.**   Now, you stated that Mr. Neefe has never given you any
trouble or anything growing up.

**A.**   No.

**Q.**   So were there ever any behavior issues that you were
concerned about?

**A.**   No.

**Q.**   Okay.  What is his relationship like with his son as far
as you know?

**A.**   With his son?

**Q.**   Yes.

**A.**   Oh, wonderful. He's the spitting image of Marshall. So
he's a mini me.  He has, he has a good relationship with him.

**Q.**   Okay.

**A.**   Yeah.

**Q.**   Good.  To your knowledge is Marshall employed?

**A.**   Yes, he is.

**Q.**   Where does he work?

**A.**   The same company that my son Cody works for, Tulpehocken's

1  Water.

2  **Q.**   Okay.  And how long has he worked there?

3  **A.**   He just went to that job a few weeks ago.

4  **Q.**   And prior to that was he employed anywhere?

5  **A.**   Yes, full-time for five years for a construction company.

6  He was on a framing crew and a driver for the Amish.

7  **Q.**   Would you say that his employment has been consistent

8  throughout his adult life?

9  **A.**   Oh, yeah, uh-huh.

10           (Brief pause.)

11  **Q.**   Now, if he's placed in your care as his third party

12  custodian you would be required not only to give him a place to

13  stay, but you also would be required to report him to either

14  probation or other authorities if there were any issues with

15  him not complying with the conditions, breaking the law, that

16  sort of thing.  Are you comfortable with doing that?

17  **A.**   Yes.

18  **Q.**   And do you -- well, you may not understand, but if you

19  were to fail to do, that you could be placing yourself in

20  danger of possibly having some legal issues.  Are you

21  comfortable with that?

22  **A.**   Yes.

23           MS. PORTER: Okay. No further questions at this time,

24  Your Honor.

25           THE COURT: Very well. Mr. Consiglio?

```
 1              CROSS EXAMINATION BY MR. CONSIGLIO:
 2  Q.   Thank you, Your Honor.  Ms. Neefe, I'm Mike Consiglio with
 3  the U.S. Attorney's Office.  I just have a few questions for
 4  you.
 5  A.   Okay.
 6  Q.   How long have you resided at your residence?
 7  A.   Let me see.  Ten years.
 8  Q.   And --
 9  A.   Prior to that we lived in Newville, and then we went,
10  moved from Newville to Mount Holly Springs.
11  Q.   And when was the most recent time that your son, the
12  defendant, lived with you?
13  A.   Oh, when -- when he moved from Newville until he left.
14  Until he was eighteen.  And then he was with Victoria.
15  Q.   So how many years is that, Ms. Neefe?
16  A.   Eight years, twenty-five to eighteen.
17  Q.   So he hasn't lived with you for eight years?
18  A.   Seven.
19  Q.   Seven?
20  A.   Trying to do the math.
21          THE COURT: I understand.
22  A.   I'm like using my fingers.
23          THE COURT: Twenty-five take away eighteen.
24  A.   Exactly.
25          THE COURT: About seven.
```

1    **A.**    Seven.

2    **Q.**    And you said you don't have regular contact with him

3    because of how busy everyone is?

4    **A.**    I would say more so with Victoria.  Marshall comes over

5    usually every weekend and I have Oliver.  Victoria just has a

6    new job, so she's been working there and, you know, so, you

7    know, but every weekend Marshall, Marshall stops over, or now

8    he has his new job.  His hours are better so he can spend more

9    quality time at home with his family, because his hours were

10   quite long working for the Amish. He would leave at 4:30 in the

11   morning, didn't get home until 7:00 at night, driving and then

12   working construction all day, which makes it hard on family

13   life, and that's why he made the decision to change his job,

14   and also to get insurance, which wasn't offered in his previous

15   employment.

16   **Q.**    And you said he works with your other son, is that right?

17   **A.**    Yes.  Cody, yes.

18   **Q.**    And Cody lives with you?

19   **A.**    Yes.

20   **Q.**    And you see your son weekly?

21   **A.**    Uh-huh.

22   **Q.**    And were you seeing him weekly back at around this time,

23   the time I'm talking, the months, the election and the months

24   leading up to --

25   **A.**    Yes.

1  **Q.**   -- January 6th?

2  **A.**   Yes, uh-huh.

3  **Q.**   Did you ever hear any conversation or communication

4  involving your son where he expressed thoughts similar to what

5  I recounted earlier in this proceeding?

6  **A.**   No, uh-uh.

7  **Q.**   Were there any conversations like this that you became

8  aware of involving your son and any other members of your

9  family?

10  **A.**   Uh-uh.

11  **Q.**   What was -- describe your relationship, the relationship

12  your son has with Cody.

13  **A.**   With Cody?

14  **Q.**   Yeah.

15  **A.**   There's four years difference with them.  You know, they

16  spend time working on cars together, you know, Cody will buy

17  something for his car and not know how to put it on and

18  Marshall and him will get together.  So they would do that at

19  the house and, you know, they don't go out and spend time

20  together anywhere, but usually, you know, it's him at our house

21  or he would go over there if they needed, you know, a lift or

22  something for the vehicles, and he would go over to Marshall's

23  residence.

24  **Q.**   And what about the relationship your son has, the

25  defendant has with your husband? Can you describe that a little

1 bit for us?

2 **A.**   He has a good relationship.  His dad kind of got him into

3 construction work and, you know, he's always relied on his dad

4 to help him out and, you know, they would hunt and fish

5 together, and he has a good relationship.

6       (Brief pause.)

7 **Q.**   I guess the ultimate question I have for you, Ms. Neefe,

8 is this, and I want you to explain as best as you can for all

9 of us involved.  There's some pretty graphic communications

10 involving your son --

11 **A.**   Uh-huh.

12 **Q.**   -- where he's using, communicating that certain groups and

13 certain individuals should be "turned into mist".

14 **A.**   Uh-huh.

15 **Q.**   "Destroyed."  Different ethnic groups, different political

16 affiliations, a different status in life, okay?  Can you

17 describe for us, is this a common form of communication in your

18 household? Is it a common form of communication involving your

19 son? What's the household that is going to be watching over

20 this defendant in this case?

21 **A.**   We're a good Christian home, and this is how he was

22 raised.  I can't say for the fact how he speaks on social media

23 or, you know, he has respect, he has respect for his parents

24 and his home.  And he's always had respect for other

25 individuals. So I really find it very hard to believe a lot of

1  the things, because he wasn't raised that way, and, you know,

2  he's been around other ethnic groups and he's never, you know,

3  he's always been polite and courteous. So I can't say any more

4  than this is not how he was raised and that's not how we

5  believe.

6              (Brief pause.)

7  **Q.**   You talked about some of the personal challenges he's had,

8  I guess some mental health issues in the past, is that right?

9  **A.**   Minimal.

10 **Q.**   Okay.

11 **A.**   Minimal as a teenager, just going through rough times.

12 **Q.**   Okay.  What about drug usage? Do you have any knowledge of

13 his drug usage?

14 **A.**   No.  I mean just every once in a while he said he smoked

15 weed or whatever.  That's about, that's about it that I was

16 aware of. He's never done anything around us or at our home.

17 So I can't, you know --

18 **Q.**   Nothing he did around you or in your home that would give

19 you cause to believe that he was using anything stronger than

20 marijuana?

21 **A.**   No.  No.

22 **Q.**   Using cocaine?

23 **A.**   No.

24 **Q.**   Using LSD?

25 **A.**   No.

1  **Q.**   And is it fair to say, Ms. Neefe, that that comes as a

2  surprise to you if there was evidence that he was using LSD?

3  **A.**   If he tried it, like most kids will do when they're around

4  their companions and somebody has something, you know, that's

5  all I can say with, you know, it was a bad choice, a bad

6  decision, and I think he realizes that.

7  **Q.**   Did you hear of him talking about the war that was going

8  to be coming?

9  **A.**   No.

10 **Q.**   The war against people in the United States?

11          MS. PORTER: Objection, Your Honor.

12          THE COURT: And the nature of the objection?

13          MS. PORTER: Just asked and answered.  She said she

14 wasn't aware of that conversation.

15          MR. CONSIGLIO: Well, I think I asked it in terms of

16 maybe racial and ethnic.

17          THE COURT: I'm going to permit a question or two just

18 so you can determine the extent to which Mrs. Neefe is aware of

19 these views, but your point that a question or two would be

20 plenty is well taken.  You may proceed.

21          MR. CONSIGLIO: Thank you, Your Honor.

22          BY MR. CONSIGLIO:

23 **Q.**   And I'll just, I'll sum it up and you describe how much of

24 this is familiar conversation with you.  The need for a war,

25 the need to kill Nancy Pelosi, the need to kill Mitch

1  McConnell, the need to take every police officer that was
2  involved in stopping them at the Capitol and lining them up and
3  killing them.  Any of this common conversation that you would
4  have heard your son engaging in at any point?
5  **A.**   No.
6  **Q.**   This is all totally new to you?
7  **A.**   I mean I -- I know that, you know, he is a Republican, has
8  Republican views, but we don't go around saying we are going to
9  kill people or do away with people.  I mean, Marshall has
10 always had the utmost respect for police officers and firemen,
11 and so whether a political affiliate, affiliation or not, I
12 don't know if that would change who my son is.
13             MR. CONSIGLIO: Your Honor, I have no further
14 questions for this witness.
15             THE COURT: Very well. Any redirect?
16             MS. PORTER: No, Your Honor.
17             THE COURT: Ma'am, thank you for coming here today,
18 and I appreciate your testimony.  I recognize this is a
19 difficult time for you and your family. Thank you. You may step
20 down.
21             THE WITNESS: Thank you.
22             (Brief pause.)
23             THE COURT: Ms. Porter, was there anything further you
24 wished to present by way of evidence or proffer before we turn
25 to argument on the government's motion?

1          MS. PORTER: Yes, Your Honor. I would like to note
2  just that I do have a letter from Mr. Neefe's employer at
3  Tulpehocken Spring Water.  It says, "To whom it may concern:
4  This letter is offered in support of Marshall Neefe.  Mr. Neefe
5  has been employed for a period of time. He has proven to be
6  punctual, accountable, and reliable as a route delivery agent
7  on behalf of Tulpehocken Spring Water.  He has been courteous
8  and well liked by fellow employees, but most importantly our
9  client base.  If the Court sees fit to be lenient with
10 Mr. Neefe, he has gainful and steady employment awaiting him
11 and his family.  If I can offer any further support or
12 background, please do not hesitate to contact me."
13         He did leave a phone number.  I don't know if the
14 government is interested in reviewing that letter, but I would
15 just like to note that despite being arrested overnight
16 Mr. Neefe does still have employment to return to.  That's all
17 the evidence we have to present.  It would only be argument at
18 this point, Your Honor.
19         THE COURT: Very well. Mr. Consiglio, is there
20 anything further you wish to present by way of testimony or
21 proffer before I turn to argument on the motion?
22         MR. CONSIGLIO: No, Your Honor.  I think there is
23 sufficient information in front of the Court for us to argue
24 detention at this point.
25         THE COURT: Then why don't I hear from Mr. Consiglio.

1  Then I'll hear from you, Ms. Porter.  And because I agree with

2  you that I do not believe this is a presumption case, do you

3  agree, Mr. Consiglio?

4           MR. CONSIGLIO: Yes, Your Honor.

5           THE COURT: Then I'm going to give Mr. Consiglio the

6  last word, because he bears the burden of proof and persuasion.

7  Mr. Consiglio, you may proceed.

8           MR. CONSIGLIO: Thank you, Your Honor.  And a lot of

9  this is echoed already by the questions I've asked of Ms. Neefe

10  and the evidence that was proffered in the course of this

11  proceeding. This goes without saying, it's the simplest idea,

12  but this Court is faced with the issue of will this defendant

13  pose a risk to the public pending resolution of this case.  And

14  it would appear based upon his lack of criminal history, it

15  appears from the testimony offered by his mother and his work

16  history, that a substantial percentage of the time, 95 percent,

17  90 percent of the time Mr. Neefe is not a problem to society

18  and he's not a problem to the community. He's working and he's

19  taking care of his family and he's taking care of his child and

20  he's going what needs to be done.

21           The problem ultimately is, as this Court knows, and

22  it's very obvious, is you don't detain 90 percent of a person.

23  You don't detain 95 percent of a person.  You are accounting

24  for all contingencies and all reasonable contingencies that

25  arise from the circumstances that are presented before the

1  Court.  What is offered by the defense as a third party

2  custodian and as a means to be the eyes and ears of this Court

3  is a household and a mom who, quite frankly, has been fooled.

4  And we do not second guess Ms. Neefe's earnestness of her

5  testimony and her presentation to the Court and her willingness

6  to step forward under these difficult circumstances, but even

7  assuming all of that is true for this Court to consider

8  release, this Court has to release the defendant to a

9  circumstance and a world in which he fooled people.

10         He fooled people dramatically, fooled people

11  dramatically in many of the most compelling aspects of his

12  life, perhaps his deepest and darkest thoughts, his deepest and

13  darkest demons that he wrestled with.  The description we've

14  heard about his personal troubles are pigeon holed to something

15  that happened ten years ago when our pretrial services report

16  speaks of events three years ago. His deepest darkest issues

17  with drugs and controlled substances and mind altering

18  substances, perhaps the use of marijuana here or there or

19  alcohol.

20         No, this is substantially deeper. This is December of

21  2020 where he is ordering twenty hits of LSD and negotiating a

22  price of how to accomplish it.  And then once it's in his hands

23  he takes a public selfie of the tab on his tongue and how he is

24  getting high.  High is not the right word for LSD, taking the

25  dose and going forward with the effects.  Most concerning is

1  these horrible views of his proper relationship between

2  society, his fellow man, and this Republic.  People of certain

3  ethnic groups should be dragged by the end of a chain up a

4  hill.  Certain religious ethnic groups are the "I suppose here

5  starts the war."  This is him responding to a statement from

6  his codefendant.  "I hate that Americans don't realize that

7  this is a Jewish problem." And his response is "Kikes."

8        We can't release him into an environment and a

9  circumstance that was so deeply fooled, so deeply fooled to the

10 point where he for months can speak with others and plan and

11 plot violence against the United States, where he can plan and

12 plot and cheer on the concept of killing the Speaker of the

13 House of the United States, killing the President, the majority

14 leader of the United States Senate, and after he engages in the

15 conduct, after he engages in the violent assault on one of the

16 most sacred days in the country, his response is, "All those

17 cops, all those people should be lined up and killed," all the

18 ones who tried to stop him.

19       We are not detaining 95 percent of the man.  We are

20 detaining 100 percent of the man.  And it's that contingency,

21 that possibility, it's the guy who will go off and deliberately

22 get a weapon and fashion it for days and weeks and carve into

23 it "Commie Knocker," who will go and speak these acts, who will

24 after it's done speak of we need to do more violence.  And

25 particularly with a history that even if 100 percent of this

1   defendant was willing and earnest at this moment in his life to

2   control himself and his urges and his thoughts as indicated in

3   his past an inability to even control himself, if he can't

4   control himself, if his family can't control and watch over it,

5   if the police trying to keep him out of the Capitol can't

6   control him, what confidence can this Court have that an order

7   of home confinement or detention will be abided by and secure

8   this community? And this Court cannot have that confidence

9   under these circumstances, and it's for this combination of

10  circumstances we ask that this defendant remain detained

11  pending resolution of this case.

12          And I do have one final point for this Court to

13  consider.  In this communication with this defendant the world

14  is divided between communism and Nazism and political and

15  government and society falls somewhere into this bizarre

16  continuum, and we know that a true republic runs like this

17  where lawyers fight each other with witnesses on the stand and

18  present evidence and we methodically and individualistically,

19  but with the big picture in hand, make fair determinations of

20  what should happen.

21          There have been six hundred and some folks who have

22  been charged with respect to this Capitol event.  A small

23  percentage of those the government has sought detention.  This

24  does fit into that category of individuals with whom the United

25  States has sought detention and who have been detained. It's

1   not a cookie cutter approach to justice.  It's an

2   individualized assessment of individuals and folks by the

3   conduct and acts with which they have engaged in, and we

4   respectfully ask this Court to use this machinery of this

5   Republic to detain him, because it's fair and it's just and it

6   fits squarely with the personal individualized facts of this

7   case.

8           THE COURT: Thank you, Mr. Consiglio. Ms. Porter?

9           MS. PORTER: Thank you, Your Honor.  Your Honor, this

10  is not Mr. Neefe's sentencing date.  I understand the strength

11  of the government's argument and evidence at this point, and we

12  appreciate that.  Mr. Neefe will get to sentencing at some

13  point if that's how this case progresses, but for today's

14  purposes the issue is whether or not there are any set of

15  conditions that can be set in place to ensure that he is

16  neither a flight risk nor a danger to I guess at this point

17  himself or anyone else or the public, and we have not seen any

18  evidence of that.

19          I think the government itself has acknowledged they

20  looked at a two month period of Mr. Neefe's twenty-five years

21  life and found some horrible things that he said.  Whether it's

22  Nazism, racism, whatever else, Your Honor, I'm a black woman, I

23  don't approve of anything that may have been said, anything

24  that may have been done.  I don't agree with any of his views.

25  But again he's not being sentenced today.  That's not why we're

here.  We're not here to agree or disagree with what he did or his thoughts or beliefs, and also we don't punish people for their thoughts and beliefs.  We punish them for their actions. And while I appreciate getting the full picture of what happened here, this really was a two month small isolated period out of this grown twenty-five year old man's life.

So to say that he has fooled his family and everyone because his mom didn't know of his Facebook communications with his other grown adult friends who don't live under her roof, I don't think that that's fair.  She stated he has not lived there for seven years.  He has a family.  He has a job.  He has ties to the community.  He's been taking care of all of those responsibilities.

What he allegedly did was stupid, he acknowledges that, but everything that he's done before that point, everything that he's done since that point shows that he can do what it takes to not only stay on the right track, but take care of his legal obligations.  He continues to have employment should he be released today. He's doing all the things that we want people to do.

We want to rehabilitate people.  We want people to improve themselves.  He has a GED.  He's employed. He has family ties.  He doesn't have a criminal record. This is not a presumption case.  I think we all agree that what took place is not to be taken lightly.  I know that a point has to be made,

1   you know, the public must know that this is not the type of
2   thing that they can do.  But again detention decisions are
3   individualized.  Mr. Neefe has shown since this incident that
4   he's capable of abiding by the law. He's capable of doing what
5   needs to be done as a grown man. He chose his mother as his
6   third party custodian because he knew that removing himself
7   from the environment with possible friends coming over or
8   possible freedom or access to the firearms or things of that
9   nature might not be appropriate.

10          He knows that in this time he needs to lean on his
11  family.  He needs someone other than his fiancee or his equal
12  that can look at him and say you need to get it together and
13  you need to keep it together.  I think Probation, who had a
14  conversation with him, is able to say that and they made that
15  determination that there are conditions.

16          I have had a conversation with him. His mother knows
17  this better than anyone.  The only person in this room who
18  hasn't had a conversation with him quite frankly is the
19  government, and they are the ones throwing out all these
20  claims.  I realize that is his job, but again Mr. Neefe is not
21  being sentenced today. We just need to determine whether or not
22  there's anything that we can do in the meantime to not only
23  keep him on his rehabilitation path, help him stay clean.
24  Whether that's a significant issue at this point or not I guess
25  is to be debated.  Whether or not he has any mental health

1   issues I guess is to be debated.  But all of those are things

2   that can be addressed with conditions.

3           Home confinement, don't leave the house unless it's

4   for work. His girl -- or excuse me, his fiancee can bring his

5   child to the house. The mother has testified the child is

6   welcome in their home. I assume the fiancee is welcome in their

7   home. All we have according to the government is a two month

8   time frame out of Mr. Neefe's twenty-five year life where he

9   said some stupid things and he made even stupider decisions.

10          And not only stupid, they are illegal, and he

11  understands that.  But he's not being sentenced today. The

12  question is just what can we do, what conditions can we set

13  right now to make sure he does what he needs to do and stays

14  out of trouble.  I think all of the conditions recommended by

15  Probation in addition to the condition of home detention with

16  electronic monitoring accomplish all of those goals.

17          We speak to all of the defendants that the government

18  deems the type of person in these type of cases that needs to

19  be detained.  Yet the government continues to harp on

20  Mr. Smith's side of the conversation, and I bring him up

21  because Mr. Smith was released yesterday.  So, you know, I

22  think if we're going to be fair, if we're going to be just at

23  this point, if we're going to look at these individualized

24  cases, then I think everything shows that Mr. Neefe is capable

25  of complying with Court conditions, and that's what we're

 1  asking Your Honor to set today.  We would only be setting him

 2  backwards to simply throw him in jail at this point and throw

 3  away the key until he completes any sentence that he may

 4  receive down the line.  Thank you.

 5          THE COURT: Thank you, Ms. Porter.  Mr. Consiglio, it

 6  is your motion.  You do not enjoy a presumption.  Are there any

 7  final thoughts that you wish to share with the Court?

 8          MR. CONSIGLIO: I have no final thoughts, Your Honor.

 9          THE COURT: Very well.

10          (Brief pause.)

11          THE COURT: Mr. Neefe, it has been my sad duty and

12  responsibility in a number of cases arising out of the events

13  of January 6th to make the kind of predictive exercise that the

14  law calls for in terms of bail or detention decisions.  I have

15  seen all too many individuals come before me who have been

16  charged in connection with an assault on the institutions of

17  this democracy.  I have seen all too many individuals who

18  engaged in conduct antithetical to the ideals upon which this

19  nation is founded.

20          I've given all those individuals who the law and the

21  Constitution demands, which is a careful individualized

22  consideration of their cases, and I must tell you, Mr. Neefe,

23  that yours is the most dark and disturbing riddle that I have

24  seen among the defendants who have come me.  It is a dark and

25  disturbing riddle, sir, because your mother is a splendid

1  person who I think has tried to do the very best by you and who

2  I believe, like me, is doubtless shocked by the allegations

3  brought against you.

4          I'm not here to punish you.  Punishment is not my

5  role.  It is not my function.  Instead I am called upon to try

6  to make some sort of predictive exercise regarding whether

7  there are conditions of release that can be set in this case.

8  And engaging in that sort of predictive exercise one thing I'm

9  obliged to consider is the nature of the charges, which are

10  profoundly grave and involve an effort to derail the

11  institutions of government and to prevent the implementation of

12  a fair and just election, and what makes these charges so very

13  grave in your case, sir, are a couple of considerations.

14          First, the grand jury has found probable cause to

15  believe that you engaged in multiple efforts to obstruct the

16  constitutionally ordained process, the miracle of democracy in

17  terms of the peaceful transition of power.  That's been a

18  hallmark of this nation from its inception, and you joined, it

19  is alleged, joined a mob bent on violence for the purpose of

20  obstructing that democratic miracle, that is the peaceful

21  transition of power, and unlike a number of defendants who I

22  have seen who were individuals who genuinely were caught up in

23  the moment, in an ugly moment on January 6th, the allegations

24  in the indictment speak to something far more premeditated, far

25  more calculated on your part. You spent weeks before January

6th preparing a weapon for the express purpose of taking that
weapon and using it.  This was not the act of a person caught
up in a moment of high drama.  This is a calculated act, a
calculated act cast against the backdrop of rhetoric indicating
a dark view of the world, embracing some of the most vile and
evil philosophies and beliefs known to man, and having
premeditated the allegations are that you acted upon those
premeditated beliefs, that you assaulted men and women of law
enforcement and that you entered that temple of democracy, our
Capitol, armed and with the goal of disrupting the
constitutionally ordained process.

          And what is perhaps most disturbing to me when I
looked at this conduct are the remarks ascribed to you on
January 6th, 2021, in Paragraph 34 of the indictment where it
is indicated that you posted after the fact, "I'm bringing a
gun next time.  It's only going to get more violent.  If I had
it my way, every cop who hurled a baton or maced on us," that
is the men and women of law enforcement who tried to uphold the
rule of law, "if I had it my way they would be lined up and put
down."

          The conduct here is shocking in its violence and its
potential for violence, and I say that this is, that you
present a dark and disturbing riddle, because your parents did
not raise you this way.  And I don't know what sort of deeply
disturbed and ugly sort of echo chamber you found yourself in,

but it clearly from what I see here in the evidence before me
has left you with a dark, disturbed, and dangerous view of the
world.  You are, sir, the most disturbing defendant I have seen
among those charged in connection with this incident for the
reasons that I have outlined here, and notwithstanding your
family's support and their efforts on your behalf, as I engage
in this predictive exercise that I must engage in an
individualized and predictive exercise, finding that the
conduct here is fraught with peril and violence and involved
disturbing violence, and violence that was celebrated after the
fact, and concerned about the lack of apparent candor in terms
of what may be polysubstance drug abuse on your part, and
concerned with the mental health history that I have before me
that is suggestive of a potential for destructive or self
destructive behavior, and recognizing the extreme gravity of
these offenses, I find by clear and convincing evidence that
you do present a danger to the community and to the safety of
others, and so I am going to order the defendant held on these
charges, although I intend to note on that order that the order
detaining the defendant is entered without prejudice to further
assessment by authorities in the District of Columbia,
recognizing that why tragically have had experience with a
number of defendants in this circumstance, that there is a much
deeper and more nuanced sense of these things that will be
possessed by my colleagues in the District of Columbia, but I

1  am going to order the defendant detained in this case at this

2  time.

3          I will also order the pretrial services report be

4  released to all counsel and will ask that you provide copies of

5  the report to your counterparts in the District of Columbia.

6  I regret that I cannot release Marshall here today because, and

7  I regret that because I think that his family are here

8  endeavoring to support him in every way that they can, and I

9  think they have tried throughout their lives to do that, but it

10  is evident to me that this dark and distorted world in which he

11  has found himself is one beyond, that was beyond their

12  knowledge and beyond their reach.

13          And so that is the order of the Court, and I will

14  direct that the defendant be therefore transported in the

15  custody of the marshals to further answer to these charges in

16  the District of Columbia.  Is there anything further,

17  Mr. Consiglio, on behalf of United States?

18          MR. CONSIGLIO: No, Your Honor.

19          THE COURT: Ms. Porter?

20          MS. PORTER: No, Your Honor.  Thank you.

21          THE COURT: I want to note, Ms. Porter, that your

22  advocacy on behalf of Mr. Neefe speaks to the very highest

23  qualities of our Constitution, that as an advocate on his

24  behalf you have embodied the guarantees of the Sixth Amendment

25  in ways that have been impressive, profound, enduring, and

1 good. Our Constitution enables individuals like Mr. Neefe to

2 enjoy the services of committed, passionate, skilled counsel,

3 and you have done all of that and you have given me much food

4 for thought as I have sat here today.

5          But it strikes me that Mr. Neefe should appreciate

6 the fact that we live in a country where skilled counsel like

7 yourself are provided as a matter of right to a criminal

8 defendant, notwithstanding perhaps his own disdain for the

9 Constitution that provides him those rights.  So I want to

10 thank you for your work here today.  I know that your

11 colleagues in the District of Columbia will also provide an

12 equal measure of assistance to Mr. Neefe.  But thank you.

13 We'll stand in recess.

14          (Hearing concluded and court adjourned at 5:20 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1   **CERTIFICATE OF OFFICIAL COURT REPORTER**

2

3   **USA vs. Marshall Neefe**

4   **1:21-MJ-00088-MCC**

5   **Detention Hearing**

6   **14 September 2021**

7

8

9        I, Wesley J. Armstrong, Federal Official Court

10  Reporter, in and for the United States District Court for

11  the Middle District of Pennsylvania, do hereby certify that

12  pursuant to Section 753, Title 28 United States Code, that

13  the foregoing is a true and correct transcript of the digitally

14  audio recorded proceedings held in the above-entitled matter,

15  and that the transcript page format is in conformance with the

16  regulations of the Judicial Conference of the United States.

17

18

19             Dated this 31st day of December 2021

20

21

22             /s/ Wesley J. Armstrong

23             _____

24             **Wesley J. Armstrong**

25             **Registered Merit Reporter**

**U.S. District Court, Middle District of PA**