### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-567-1 (RCL)** |
| **MARSHALL NEEFE,** | |
| *Defendant.* | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence defendant Marshall Neefe to 46 months of incarceration, the middle of the Guidelines range to which the parties stipulated in their plea agreement, three years of supervised release, $2,000 in restitution, and the mandatory $100 special assessment for each count of conviction.

## I.     INTRODUCTION

Neefe, who conspired for two months to stop the Congressional certification of the 2020 Presidential election by violence, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured over 100 law-enforcement officers, and resulted in over $2.7 million in losses.[1]

---

[1] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

In the weeks leading up to January 6, 2021, Neefe and his codefendant, Charles Bradford Smith, coordinated and planned to travel to Washington, D.C., on January 6 and were prepared to violently ensure that Donald Trump would remain president following Congress's certification proceeding.   Neefe and Smith discussed bringing weapons to Washington, and Neefe fabricated a wooden club—which he named the "Commie Knocker"—that he carried on to the Capitol grounds.   Neefe and Smith participated with other members of a mob in thrusting a large metal sign frame into a defensive line of U.S. Capitol Police and D.C. Metropolitan Police Department officers.   After the officers' line broke, Neefe entered the Capitol, disregarded police officers' commands to leave the Capitol Rotunda, and exited the building after spending over 40 minutes inside.   During the evening hours following the Capitol breach, Neefe showed no remorse. Through Facebook, he expressed pride about getting tear gassed and breaching the Capitol; vowed he would "bring[] a gun next time"; opined that the events earlier that day were "total pussy shit"; and stated, "If I had it my way every cop who hurled a baton or maced on [*sic*] of us would be lined up and put down . . . We made sure they knew we fucking OWN them."

As explained herein, a 46-month sentence would reflect the gravity of Neefe's conduct but also acknowledge his early admission of guilt.

## II.      FACTUAL BACKGROUND

### A.      The January 6, 2021, Attack on the Capitol

On January 6, 2021, hundreds of rioters, Neefe among them, unlawfully broke into the Capitol in an effort to disrupt the peaceful transfer of power after the November 3, 2020, Presidential election.   Many rioters attacked and injured law-enforcement officers, sometimes with dangerous weapons; they terrified congressional staff and others on scene that day, many of

whom fled for their safety; and they ransacked this historic building—vandalizing, damaging, and stealing artwork, furniture, and other property.   Although the facts and circumstances surrounding the actions of each rioter who breached the Capitol and its grounds differ, each rioter's actions were illegal and contributed, directly or indirectly, to the violence and destruction that day.   *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).

As set forth in the Presentence Report ("PSR") and the Statement of Offense incorporated into Neefe's plea agreement, a joint session of Congress had convened at 1:00 p.m.[2] at the Capitol. Members of the House of Representatives and the Senate were meeting in separate chambers to certify the vote count of the Electoral College of the November 3, 2020, Presidential election.   By 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued, a large crowd gathered outside the Capitol.   Temporary and permanent barricades were in place around the exterior of the building, and U.S. Capitol Police ("USCP") were present and attempting to keep the crowd away from the building and the proceedings underway inside.   At 2:00 p.m., certain individuals forced their way over the barricades and past the officers, and the crowd advanced to the exterior of the building.   Members of the crowd did not submit to standard security screenings or weapons checks by security officials.

The vote certification proceedings were still underway, and the exterior doors and windows

---

[2] All times indicated in the factual background are approximate.

of the Capitol were locked or otherwise secured.   USCP officers attempted to keep the crowd from entering; however, shortly after 2:00 p.m., individuals in the crowd forced their way in, breaking windows and assaulting law-enforcement officers along the way, while others in the crowd cheered them on.

At 2:20 p.m., members of the House of Representatives and the Senate, including the President of the Senate, Vice President Pence, were forced to evacuate the chambers. All proceedings, including the joint session, were effectively suspended.   The proceedings resumed around 8:00 p.m. after the building had been secured.   Vice President Pence remained in the Capitol from the time he was evacuated from the Senate Chamber until the session resumed. (ECF 67 (Statement of Offense) at 1-3; PSR at 6-7.)

### *Injuries to Law-Enforcement Officers Caused by the January 6, 2021, Attack*

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021) (Judge Moss); *see also United States v. Foy*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system.") (Judge Chutkan); *United States v. Chrestman*, 535 F. Supp. 3d 14, 25 (D.D.C. 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the

rule of law.") (Chief Judge Howell).

In addition, the rioters injured over 100 police officers.  *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf (describing officer injuries).   Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with law-enforcement officers.  *See id*. at 27-30.

Moreover, the rioters inflicted significant emotional injuries on police officers and others on scene that day who feared for their safety. *See id*; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

**B.**     **Neefe's Role in the January 6, 2021, Attack on the Capitol**

*Prior Planning Leading Up to January 6, 2021*

From at least November 4, 2020, and continuing up to and including January 6, 2021, Neefe and his coconspirator, Smith, used Facebook to communicate with each other and others to express dissatisfaction with the results of the 2020 Presidential election and share thoughts about how Donald Trump could remain president following the certification of the Electoral College vote, set to occur in Washington, D.C., on January 6, 2021.

On November 4, 2020, the day after Election Day, Neefe wrote Smith, "Im getting ready to storm D.C. . . .   Seriously tho if biden wins theres a good chance ill do something for the better of man."   Smith remarked, "We all deep down knew this was how the election was going to go. Now if Trump wins the riots will be 50 times worse."   Neefe replied, "Hope it burns either way." Smith added, "Me to.   This country needs to split up immediately."   Neefe replied, "Why shouldnt we be the ones to kick it off?"

In the weeks leading up to January 6, 2021, Neefe and Smith shared their intentions and plans to travel to Washington on that date with one another and others.   For example, on December 22, 2020, Neefe and Smith had the following conversation on Facebook:

> SMITH:       The call to action was put out to be in DC on January 6th from the Don himself.   The reason is that's the day pence counts them up and if the entire city is full of trump supporters it will stop the for sure riots from burning down the city at least for a while.
>
> NEEFE:       We goin?
>
> NEEFE:       Cause hot damn son i really wanna crack some commie skulls

Smith also encouraged others to join him and Neefe to travel to Washington on January 6, 2021.   Smith wrote another Facebook user on December 22, 2020, "Hey man if you wanna go down to DC on the 6th Trump is asking everyone to go. That's the day Pence counts up the votes

6

and they need supporters to fill the streets so when they refuse to back down the city doesn't burn down right away.   It's the only time hes ever specifically asked for people to show up.   He didn't say that's why but it's obviously why."

On December 22-23, 2020, Smith messaged other Facebook users to urge them to come to Washington, D.C., "to fill the streets so when they refuse to back down the city doesn't burn down right away," and told a Facebook friend he could "ride down with Me & Marshall."   Smith also told a friend they were buying axe handles and nailing American flags to them, "so we can wave the flag but also have a giant beating stick just in case."

From December 25-26, 2020, Neefe and Smith discussed bringing "batons" with them to Washington on January 6, 2021.   Neefe sent a photograph of a wooden club he had made to Smith and others, and had the following conversation with another individual, as depicted in this photo from his Facebook records and the following dialogue:



| | |
|---|---|
| NEEFE: | Now introducing The Commie Knocker |
| NEEFE: | Getting prepped for the 6th lol |
| Other User: | Awh hell yeah what's the 6th |

NEEFE:          Going to D.C. to make sure them lil bitches dont burn down the city
                when trump is announced as president

On December 31, 2020, Neefe and Smith continued to discuss the election results and their

plans to attend the upcoming rally in Washington, D.C., on January 6, 2021.   Smith messaged

Neefe, "I cant wait for DC! Apparently it's going to be WAY bigger lol.   If it's big enough we

should all just storm the buildings. . . .   Seriously. I was talking to my Dad about how easy that

would be with enough people."

***Neefe's Participation in the Capitol Attack:
A Cemented Conspiracy, Assault on Officers, and Unlawful Entry into the Capitol***

On January 6, 2021, Smith communicated on Facebook that he and Neefe traveled to

Washington, D.C., together, and referred to Neefe as his "ride."   Photos and videos taken on

January 6, 2021, and shared on their Facebook pages show both Neefe and Smith outside the

Capitol on that date, approaching the Capitol grounds, and on the grounds participating in the riot.

Smith later shared on Facebook a video that shows Smith walking toward the Capitol building

with Neefe, stating as they both smiled, "They're rushing the Capitol right now. . . . There's people

literally rushing it right now.   Sic semper tyrannis."[3]   Smith sent this video to another Facebook

---

[3] This is a Latin phrase meaning "thus always to tyrants" and the motto of the Commonwealth of
Virginia.   Definition of "Sic Semper Tyrannis," Merriam-Webster.com, https://www.merriam-
webster.com/dictionary/sic%20semper%20tyrannis (last visited Aug. 7, 2022).   It suggests and
affirms that bad consequences will always befall tyrants and has origins in classical literature and
history.   Mike Fontaine, *The Real Source behind "Sic Semper Tyrannis,"* Medium (May 6, 2021),
https://medium.com/in-medias-res/the-real-source-behind-sic-semper-tyrannis-b2bc3ddc70dc.
In American history, John Wilkes Booth exclaimed the phrase at Ford's Theater when he
assassinated President Abraham Lincoln on April 14, 1865.   *See* From War Department Dispatch
to the New York Times, *AWFUL EVENT.   President Lincoln Shot by an Assassin,* N.Y. Times,
Apr. 15, 1865, at 1, available at https://timesmachine.nytimes.com/timesmachine/1865/04/15/p/1
("During the third act [of the performance that evening,] . . . a man rushed to the front of the
President's box, waving a long dagger in his right hand, and exclaiming "*Sic semper tyrannis*,"
and immediately leaped from the box . . . to the stage beneath, and ran across to the opposite side,

user with the caption "Heres when we first got there and just started rushing it.   First few hundred people to hit it."   Smith's video depicts him and Neefe together, walking towards the Capitol, smiling, with Neefe holding the wooden club, as depicted in this image:



On a video he recorded as he approached the Capitol building from the Capitol lawn, Smith stated, with Neefe walking beside him, "We are literally storming the Capitol.   The gate – this whole area is blocked off to the public.   We're saying, 'Fuck it!'   Sic semper tyrannis, bitch. Down with tyrants."   Seconds after Smith made this statement, his video recorded this image of Neefe, raising his club with a flag attached to it above his head and cementing their agreement to obstruct Congress's certification of the Electoral College vote:

---

making his escape amid the bewilderment of the audience from the rear of the theatre, and mounting a horse, fled.   The screams of Mrs. Lincoln first disclosed the fact to the audience that the President had been shot . . . .").



In another video Smith recorded after he and Neefe entered Capitol grounds, Smith stated, "We're literally here.   We stormed the gates of the Capitol.   Everybody just kept rushing."   He then turned the camera on Neefe, who appeared to be within arm's length of Smith and was still holding the wooden club in his right hand, and stated, "What's up, Marshall?"   Neefe responded by looking into the camera and nodding affirmatively, again solidifying their conspiracy to obstruct Congress's certification of the Electoral College vote.

On the Capitol grounds, Neefe and Smith positioned themselves at the West Front, the site of the temporary stage that was erected in anticipation of Inauguration Day, which was two weeks away.   On the West Front at approximately 1:40 p.m., Neefe and Smith participated in hoisting and pushing a large metal sign frame holding an oversized "TRUMP" sign into a defensive line of Metropolitan Police Department ("MPD") and USCP officers attempting to prevent rioters from

further advancing toward the Capitol building.   The all-metal sign frame was at least eight feet tall and 10 feet wide, welded with screws, and supported by large casters that were approximately the size of an adult's head.   As described by USCP Officer N.S., who was part of the defensive line, the sign frame was heavy and very sturdy and, in part due to the relatively sharp edges of the metal frame, could have "split someone's head open."   Officers such as N.S. and others not wearing a helmet who were near or came in contact with the sign frame were particularly vulnerable to serious injury or worse.

Images of Neefe and Smith participating in the sign-frame assault are depicted below, from opposite angles (Neefe outlined in yellow and Smith outlined in green):





Of note, in the second image, above, Neefe's right hand is on the frame of the sign as he, Smith, and others assist in moving the sign forward into the line of defending officers.   Video evidence shows Neefe's hands on the sign frame for at least 10 seconds, including while the sign made contact with the officers' line.   Neefe advanced forward with the sign and other rioters into the officers' line, and retreated from the line after officers drove him and others back with pepper spray.

The officers who were assaulted with the sign frame and other officers at the Capitol's West Front had defended their lines for over an hour from various confrontations and attacks by the mob.   The hundreds of officers on the West Front were flanked, outnumbered, and under continuous assault from the thousands of rioters directly in front of them as well as members of the mob who had climbed up onto scaffolding above and to the side of them, many of whom were hurling projectiles.   Because many of the thousands of people surrounding the officers were not engaged in assaultive conduct, it was difficult for officers to identify individual attackers or defend

themselves.   Further exacerbating their predicament, officers had no idea who were armed or not. By 2:28 p.m., with their situation untenable and openings in the perimeter having already led to breaches of the building, several large gaps appeared in the police's defensive line at the West Front and a general retreat was called.   With their defensive lines extinguished, several police officers were surrounded by the crowd.   The rioters had seized control of the West Plaza and the inauguration stage.   There were no longer manned defenses between the crowd and several entrances into the Capitol, allowing the stream of rioters that had started entering the building around 2:13 p.m. to build to a torrent, as depicted in the photos, below:





*Breakthroughs in the defensive line on both the left and right flanks (top) caused the entire police line to collapse and individual officers were swallowed by the crowd (middle) and many officers were assaulted as they waited in a group to retreat through doors and stairwells up onto the inaugural stage (bottom).*

After the defensive line broke, Neefe entered the Capitol building at the Upper West Terrace

Door at approximately 2:36 p.m., as depicted below (circled in yellow):



Inside the Rotunda around 3:08 p.m., he attempted to make himself immovable and disregarded

commands from police officers to leave the Rotunda, as depicted in these screenshots from police

body-worn-camera video (circled in yellow):



Video evidence did not show Neefe assaulting the officers in the Rotunda.   He eventually exited the building at the East Rotunda Doors around 3:17 p.m., as depicted below (circled in yellow), over 40 minutes after he entered the Capitol:



### *Neefe's Comments Shortly after His Participation in the Capitol Attack and Subsequent Conduct*

As revealed in his Facebook records, Neefe celebrated his crimes after he and Smith left the Capitol grounds on January 6, 2021.

From 8:56-8:59 p.m. on January 6, Neefe commented on photos of himself at the Capitol earlier that day that Smith had shared: "Mace, pepper balls and tear gas lol im battle ready folks." He also said, "literally cannot count how many times i was maced.   Got a good shot in the mouth tho.   Doesnt taste too bad.   Got shot 3 times with pepper balls and tear gassed in the building lol," and "I was amidst some of the first to make my way in. . . . Shit was fucking CRAZY DUDE. . . . Adrenaline rush like literally nothing else."   At 9:04 p.m., he remarked via Facebook messenger about someone getting shot at the Capitol and stated, "Then we heard the news on pence . . . Amd lost it . . . So we stormed."

At 9:12 p.m., Neefe continued discussing his participation in the riot with another Facebook user and stated, "Im bringing a gun next time idec," the last word being an internet abbreviation for "I don't even care."   From 9:13-9:14 p.m., he continued the discussion by expressing his expectation that further violence would occur and his desire to "line[] up and put down" officers who defended the Capitol:

> Its only going to get more violent . . .   Today was total pussy shit dude . . . If I had it my way every cop who hurled a baton or maced on of us would be lined up and put down . . .   We made sure they knew we fucking OWN them.

In the days following January 6, 2021, Neefe texted others about his concerns he would be identified and arrested for his participation in the Capitol riot.   On January 7, 2021, at 5:05 p.m., Neefe texted Smith, "[. . .] if my face comes up I'm fucked dude."   Smith replied, "You could shave.   Both of us have alot of facial hair."   Neefe responded, "True probably going to tonight."

At approximately 6:08 p.m., Neefe admitted in a text message to his mother that he had deleted "all my social media." Facebook records confirmed that Neefe's account was deactivated that day. Neefe also pledged to his mother, "Smart phone goes away next."

On January 13, 2021, at approximately 11:43 p.m., Neefe texted Smith, "NGL [not gonna lie] man I kinda realized how bad I goofed." Neefe later asked, "Is there anything you feel I should or shouldn't do atm [at the moment] cause man I'm fucking scared." Smith replied, "Get rid of your 'stuff' put it with your parents or someone else." Neefe responded, "Ight [alright]. Imma have someone help me out." Neefe then contacted another individual to ask if he could store some of his "stuff" in that person's basement, though the government has not confirmed that this actually occurred.

### *Neefe's Arrest and Postarrest Interviews*

FBI agents arrested Neefe at his home in Newville, Pennsylvania, on September 13, 2021. Following his arrest, he gave a voluntary, post-*Miranda* interview with the FBI. As reported in the FBI's summary of that interview, Neefe said he was heavily influenced by QAnon conspiracy theories and that he and Smith discussed plans to travel to Washington within a month of January 6, 2021. He admitted making a wooden club with an American flag stapled to it to take to Washington to serve as a barrier between himself and "possible Antifa."

Neefe said that after arriving in Washington that day and attending the rally President Trump had planned, he and Smith followed the crowd to the Capitol. Neefe admitted breaking through a security barrier and screaming at the politicians inside the Capitol. He also confessed that he and others passed a large "TRUMP" sign overhead and used it to disrupt and break through a police line. He said he was struck with mace and pepper balls.

Neefe also admitted he was part of a group that pushed against the police at a door to the Capitol.   At some point, police stepped aside and the rioters got inside the building.   Neefe admitted being in the Rotunda and a nearby hallway, and at some point, he got "knocked over" and lost the club he brought with him.   He got sprayed with mace again inside the Capitol and decided to leave.

Neefe told the FBI he believed what he did on January 6, 2021, was wrong and he no longer supports QAnon conspiracy theories.   According to an FBI task-force officer who interviewed him, Neefe expressed some remorse and believed law enforcement would be coming for him due to his actions on January 6, 2021.

During his court processing and interview with the Pretrial Services Agency ("PSA"), Neefe reported he owned a Canik .9mm handgun and an Armalite AR-10 rifle.   In addition, Neefe reported a recent substance-abuse history of drinking alcohol (monthly, with his last use about one month before his arrest) and taking cannabinoids (weekly, last use one week before arrest).

### *Injuries*

The government has identified at least three victims of the assault with the large metal sign frame: MPD Officers S.B. and J.C. and USCP Officer N.S.   Although none of these officers reported suffering any physical injuries during the assault, Neefe's participation in this riot aided those rioters who did succeed in injuring officers.   *See* Section II(A) ("Injuries to Law-Enforcement Officers Caused by the January 6, 2021, Attack"), *supra*.   His violent conduct served to incite and embolden other violent rioters around him.

### III.    THE CHARGES AND PLEA AGREEMENT

On January 26, 2022, a federal grand jury returned a superseding indictment charging

Neefe with 12 counts:

(1)  <u>Count One:</u> Conspiracy to Commit Obstruction of an Official Proceeding (in violation of 18 U.S.C. §1512(k));

(2)  <u>Count Two:</u> Obstruction of an Official Proceeding and Aiding and Abetting (18 U.S.C. §§ 1512(c)(2), 2);

(3)  <u>Count Three:</u> Civil Disorder (18 U.S.C. § 231(a)(3));

(4)  <u>Count Four:</u> Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon and Aiding and Abetting (18 U.S.C. §§ 111(a)(1) and (b), 2);

(5)  <u>Count Five:</u>  Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon (Wooden Club) (18 U.S.C. § 1752(a)(1) and (b)(1)(A);

(6)  <u>Count Six:</u> Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon (Large Metal Sign Frame) (18 U.S.C. § 1752(a)(1) and (b)(1)(A);

(7)  <u>Count Seven:</u> Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon (Wooden Club) (18 U.S.C. § 1752(a)(2) and (b)(1)(A));

(8)  <u>Count Eight:</u> Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon (Large Metal Sign Frame) (18 U.S.C. § 1752(a)(2) and (b)(1)(A));

(9)  <u>Count Ten:</u> Engaging in Physical Violence in a Restricted Building or grounds with a Deadly or Dangerous Weapon (Large Metal Sign Frame) and Aiding and Abetting (18 U.S.C. §§ 1754(a)(4) and (b)(1)(A), 2);

(10)  <u>Count Eleven:</u> Disorderly Conduct in a Capitol Building or Grounds (40 U.S.C. § 5104(e)(2)(D));

(11)  <u>Count Thirteen:</u> Act of Physical Violence in the Capitol Grounds or Buildings (40 U.S.C. § 5104(e)(2)(F)); and

(12)  <u>Count Fourteen:</u>  Parading, Demonstrating, or Picketing in a Capitol Building (40 U.S.C. § 5104(e)(2)(G)).

On May 3, 2022, Neefe pleaded guilty to Count One, Conspiracy to Obstruct an Official Proceeding, in violation of 18 U.S.C. § 1512(k), and a lesser-included offense of Count Four, Assaulting, Resisting, or Impeding Certain Officers and Aiding and Abetting, in violation of 18 U.S.C. §§ 111(a)(1), 2.   The lesser-included offense of Count Four does not include the charged

weapon enhancement under 18 U.S.C. § 111(b).

## IV.    STATUTORY PENALTIES

Neefe now faces sentencing on Conspiracy to Obstruct an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2) (Count One), and Assaulting, Resisting, or Impeding Certain Officers and Aiding and Abetting, in violation of 18 U.S.C. §§ 111(a)(1), 2 (lesser include offense of Count Four).

As noted by the plea agreement and the U.S. Probation Office ("USPO"), Neefe faces up to 20 years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years for Conspiracy to Obstruct an Official Proceeding.

As noted by the plea agreement and the USPO, Neefe faces up to eight years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years for Assaulting, Resisting, or Impeding Certain Officers and Aiding and Abetting.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).   "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49.   The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing.   *Id.* at 49.

The PSR does not include a Guidelines analysis for both Counts—Counts One and Four—

to which Neefe pleaded guilty. (*See* PSR at 11-12.)   Sections 1B.1(a)(1)-(3) of the Guidelines describe the steps a sentencing court must follow to determine the Guidelines range, which include determining the applicable Guideline, determining the base offense level, applying appropriate special offense characteristics, and applying any applicable Chapter 3 adjustments. Under U.S.S.G. § 1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G.   § 1B1.1(a)(1)-(3) must be "repeat[ed]" for "each count."   Only after the Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) is performed is it appropriate to "[a]pply" the grouping analysis as set out in Chapter 3.

The PSR did not follow all these steps.   It concludes (PSR at ¶ 48) that Counts One and Four group—a conclusion with which the government agrees—but does not set forth the Guidelines calculation for each count as required under U.S.S.G. § 1B1.1(a)(4). That Guidelines analysis follows:

Count One: 18 U.S.C. § 1512(k)

| | | |
|---|---|---|
| U.S.S.G. § 2X1.1(a), (b): | Conspiracy Cross-Reference | |
| U.S.S.G. § 2J1.2(a): | Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(1)(B): | Threat or Physical Injury to Person or Property | +8 |
| U.S.S.G. § 2B1.1(b)(2): | Resulted in Substantial Interference with Administration of Justice | +3 |
| | **Total:** | **25** |

Count Four: 18 U.S.C. §§ 111(a)(1), 2

| | | |
|---|---|---|
| U.S.S.G. § 2X2.1: | Aiding and Abetting Cross-Reference | |
| U.S.S.G. § 2A2.2(a)[4]: | Base Offense Level | 14 |

---

[4] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

| | | |
|---|---|---:|
| U.S.S.G. § 2A2.2(b)(2)(B): | Dangerous Weapon Used | +4 |
| U.S.S.G. § 3A1.2(b): | Official Victim | +6 |

|  | **Total** | **24** |
|---|---|---:|

| | |
|---|---:|
| **Combined Offense Level** | **25** |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | -3 |

| | |
|---|---:|
| **Total Adjusted Offense Level:** | **22** |

(*See* ECF 66 (Plea Agreement) at 3.)

In any event, the government agrees with the USPO's conclusion that Neefe's total offense level is 22.   (PSR at ¶ 60.)   The USPO calculated Neefe's criminal history as category I, which the government also does not dispute.   (PSR at ¶ 63.)   Accordingly, based on the government's and the USPO's calculation of his total adjusted offense level, after a three-level downward adjustment under U.S.S.G. § 3E1.1(a) and (b) for acceptance of responsibility, (PSR at ¶ 58-59), Neefe's Guidelines imprisonment range is 41-51 months.   (PSR at ¶ 104.)   Neefe's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6).   In this case, as described below, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

22

### A.    Nature and Circumstances of the Offense

The attack on the Capitol on January 6, 2021, is a criminal offense unparalleled in American history.   It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the Capitol building was literally occupied by hostile participants.   By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his or her individual conduct, all individuals who entered the Capitol and assaulted police on January 6 did so under the most extreme of circumstances, to which their conduct directly contributed.   As individuals entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades, heard the throes of a mob, and smelled chemical irritants in the air.   Depending on the timing and location of their approach, in addition to their own acts of violence, they likely would have observed other extensive fighting with police.

While looking at a defendant's individual conduct, we must assess such conduct on a spectrum.   This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged any acts of property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition.   While these factors are not exhaustive nor dispositive, they help to place individual

defendants on a spectrum as to their fair and just punishment.

The nature and circumstances of Neefe's crimes weigh heavily towards a significant term of incarceration.

Neefe's planning, statements, and actions before and leading up to his participation in the riot demonstrate that he conspired with Smith to obstruct an official proceeding, that is, Congress's certification of the Electoral College vote count, on January 6, 2021.   Dismayed by the election results being tallied after Election Day, Neefe intimated to Smith as early as November 4, 2020, that he was "getting ready to storm D.C." and contemplating "do[ing] something for the better of man" if Joe Biden won the Presidential election.   Multiple times, he and Smith shared extremist and violent ideas about the impact of the election on the Nation.   When they pondered the possibility of a civil war, Neefe asked Smith, "Why shouldnt we be the ones to kick it off?"   Neefe also expressed a desire for the country to "burn[]" however the election turned out.

In December 2020, as Neefe and Smith's plans to travel to Washington on January 6 progressed, Neefe pined to "crack some commie skulls."   He took the extraordinary measure of fabricating a weapon—the wooden club he proudly named the "Commie Knocker"—to take to Washington.   After sharing a photo of the club, he told a Facebook user he wanted to "make sure them lil bitches dont burn down the city when trump is announced as president."

On January 6, 2021, Neefe and Smith executed their conspiracy when Smith proclaimed, "We are literally storming the Capitol" as they unlawfully entered the Capitol grounds and Neefe raised his wooden club in an affirmative gesture.   After entering the grounds at the West Front, Neefe and Smith joined a simmering mob, with a multitude of individuals angrily confronting police officers who desperately attempted to secure a perimeter so rioters could not advance toward

the Capitol.

During a particularly precarious point in the riot, numerous rioters hoisted a large, heavy metal sign frame supporting an oversized "TRUMP" sign and pushed it forward toward a line of officers in front of the Capitol's Lower West Terrace.   Neefe and Smith were positioned close to this defensive line, and as the sign frame neared them, they joined in grasping the sign above their heads and pushing it forward into the officers.   Neefe handled the sign for at least 10 seconds— including while the sign made contact with the officers—and advanced forward with the sign up a few steps into a slightly elevated area where the police line had been positioned.   He retreated a short distance when officers regrouped and drove him and others down the steps with pepper spray.

Even after participating in the assault of officers and getting sprayed with a chemical irritant, Neefe was undeterred.   After the police line in front of the Lower West Terrace broke, he advanced toward the Capitol.   By his own admission, he was part of a group that pushed against police at an entryway, and he eventually breached the building at the Upper West Terrace Door. Video evidence depicted Neefe attempting to make himself immovable and disobeying numerous commands to leave the Rotunda as officers attempted to corral and drive out the rioters. Eventually, officers amassed the force to clear the space.   Neefe left, exiting the Capitol over 40 minutes after he entered the building.   By this significant incursion,[5] he directly participated in

---

[5] A 40-minute breach was significantly longer that many other defendants who have been prosecuted for unlawful conduct inside the Capitol.   *See., e.g., United States v. Valerie Ehrke,* 21-cr-00097 (PFF) (defendant entered Capitol for approximately one minute or less); *United States v. Anna Morgan-Lloyd,* 21-cr-00164 (RCL) (approximately five minutes); *United States v. Sean Cordon,* 21-cr-00269 (TNM) (approximately five minutes); *United States v. Jonathan Sanders,* 21-cr-00384 (CJN) (approximately five minutes); *United States v. Kevin Cordon,* 21-cr-00277 (TNM) (approximately five minutes); *United States v. Leonard Gruppo,* 21-cr-00391 (BAH) (approximately six minutes); *United States v. Scott Fairlamb,* 1:21-cr-00120 (RCL) (under 10 minutes); *United States v. Erik Torrens,* 21-cr-00204 (BAH) (approximately 10 minutes); *United*

delaying the certification of the Electoral College vote, causing dismay to millions of Americans—and even people around the world who view the United States as a beacon of democracy.

Neefe's actions on January 6 showed an absolute disregard for the rule of law coupled with an eagerness to engage in violence.   As if his conduct leading up to and during the riot were not troubling enough, Neefe was proud of his actions and showed no contrition in his Facebook messages after the riot.   He reveled that being part of the riot was an "[a]drenaline rush like literally nothing else."   And he threatened that worse was yet to come.   On the night of January 6, he referred to the events from earlier that day as "total pussy shit" and threatened to bring a gun the next time he tried to stymie an election.   In his warped view, the besieged officers who defended against the attack on the Capitol deserved to "be lined up and put down."   He relished that "[w]e made sure they knew we fucking OWN them."

Further, in the days after the riot, as Neefe feared being identified as someone who participated in the attack, he deleted his social media and deactivated his Facebook account, planned to get rid of his smart phone, talked about changing his appearance, and attempted to arrange to secrete some of his "stuff" – presumably, evidence tying him to unlawful conduct at the Capitol—to another individual's basement.   Indeed, as this Court concluded after the detention hearing, these actions do not indicate remorse; rather, they suggest the conduct "of a man lying low." *United States v. Neefe,* No. 21-cr-567, 2021 WL 703999, at *7 (D.D.C. Mar. 9, 2022).

---

*States v. Frank J. Scavo,* 21-cr-00254 (RCL) (approximately 10 minutes); *United States v. Jennifer Ryan,* 21-cr-00050 (CRC) (approximately 10 minutes); *United States v. Donna Sue Bissey,* 21-cr-00165 (TSC) (a little over 10 minutes); *United States v. John Wilkerson,* 21-cr-00302 (CCC) (approximately 20-25 minutes); *United States v. Andrew Bennett,* 21-cr-00227 (JEB) (approximately 30 minutes); *United States v. David Mish,* 21-cr-00112 (CJN) (approximately 30 minutes).

Pursuant to the terms of his plea agreement, Neefe agreed to submit to a debriefing with law-enforcement officials.   At multiple points before entering into the agreement, he expressed a willingness, through his counsel, to debrief.   However, the government has not required him to do so.   As noted above, Neefe did submit to a custodial interview after his arrest on September 21, 2021, and he candidly admitted participating in the riot, including bringing his wooden club to the Capitol and engaging with others in the sign assault.   During his interview, he also belatedly admitted that his conduct was "wrong" and expressed some remorse.

Despite these mitigating factors, the seriousness of Neefe's offenses—including his preplanning and agreement to obstruct the Electoral College certification; making and carrying a weapon onto the grounds and, by his own admission, into the Capitol building; participation in the sign assault; failure to obey police commands to vacate the Rotunda; and significant time spent inside the Capitol—demands a lengthy sentence of imprisonment.

### B.   Neefe's History and Characteristics

Neefe has no prior criminal convictions.   But his characteristics provide ample evidence of prior potential criminal conduct and other troubling behavior.

As established during the detention hearing in this case on February 23, 2022, Neefe has a significant history of abusing controlled substances while possessing firearms and ammunition.   As revealed in his Facebook records, in November and December 2020, Neefe admitted to routinely using "dabs" of marijuana concentrate, a controlled substance and a more potent form of cannabis product than a typical marijuana cigarette or "joint."   *Neefe,* 2021 WL at *2.   He also used Facebook Messenger to secure a purchase of lysergic acid diethylamide ("LSD"), a hallucinogenic controlled substance, and shared photos of himself using LSD.   *Id.*

When he was arrested in September 2021, he admitted to PSA that he had recently used cannabinoids.

In addition, Neefe's Facebook communications reveal that during the entire period from November 2020 until his arrest in September 2021, he possessed ammunition and firearms.   *Id.* He further admitted to the PSA that he owned at least two firearms, a nine-millimeter handgun and an AR-10 rifle.   The Facebook evidence and Neefe's own admissions underscore the sheer danger of having a drug user or addict possess loaded firearms. *See, e.g.,* 18 U.S.C. 922(g)(3) (criminalizing possession of firearms or ammunition for addicts).

Facebook records also reveal that January 6, 2021, was not the first time Neefe prepared to use a weapon during a political confrontation in Washington.   In conversations with Smith in November 2020, Neefe and Smith made plans to travel to another pro-Trump rally in Washington on November 14, 2020.   During these conversations, Neefe noted he would bring his "big boi"—a large, military-style knife—to the rally, and said he hoped he would get "to smack around a few commies."   He also previewed a line he would use at that rally: "I've killed 5 chickens with this blade, lets make it 6."   *Neefe,* 2021 WL at *1.

Further, Neefe's Facebook records in the months before January 6, 2021, revealed a disturbing history of extremist, racist, and anti-Semitic views coupled with violent rhetoric. Throughout their Facebook conversations, Neefe and Smith repeatedly spoke favorably of fascism, Nazism, and the possibility of civil war in the United States.   For example, on November 4, 2020, when Neefe and Smith discussed their dismay about the election results, Smith remarked, "This country needs to split up immediately."   Neefe replied, "Why shouldnt we be the ones to kick it off?"   *Id.*

On November 6, 2020, a friend messaged Neefe, "Is Biden really going to win?   How is the only question."   Neefe replied, "at this point it doesn't matter who wins to me.   Brad [Smith] and I predict this goes go supreme court and trump gets the win, then the country goes to war.   All jokes aside damned if we do damned if we don't.   This place is about to burn and we are getting a survival/escape plan together."

Neefe also expressed a desire that "commies" should be harmed or killed—once opining, "These sick fucks really do need to start getting turned into mist"—and once joked that he would not need a tree to lynch a Black man because "Rope on my bumper works wonders."   On another occasion while continuing to discuss election results, Neefe remarked, "Looks like mcconnel needs a bullet in the head," apparently referring to Senator Mitch McConnell.   *Id.* at *6.

As this Court noted following the detention hearing, "not only did Neefe repeatedly invoke the potential of violent conflict, he followed through—he stormed the Capitol, armed with 'The Commie Knocker.'   These were not idle threats."   *Id.*   Neefe's history of potentially unlawful possession of firearms and ammunition, dangerous behavior, and violent ideations militate in favor of a sentence of significant incarceration.

### C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration

of the democratic process."[6]   As with the nature and circumstances of the offense, this factor

supports a sentence of incarceration.

Neefe's criminal conduct—conspiring to corruptly obstruct an official proceeding and

assaulting law-enforcement officers—is the epitome of disrespect for the law.  He engaged in

considerable planning to travel to Washington on the date of the certification proceeding.  He

discussed "storm[ing]" the Capitol and prepared for violent confrontation by fabricating a weapon

to bring within him.  When he entered the Capitol grounds, and later the Capitol itself, it was

abundantly clear to him that lawmakers, and the law-enforcement officers who tried to protect

them, were under siege.  Law-enforcement officers were overwhelmed, outnumbered, and in

some cases, in serious danger.   Through his direct actions during the assault with the sign frame,

he further imperiled the officers and other individuals; as one officer victim remarked, the sign

frame could have "split someone's head open."

Neefe and his fellow rioters not only flouted the rule of law that day; they eviscerated it.

A lesser sentence would suggest to the public, in general, and other rioters, specifically, that

attempts to obstruct official proceedings and assaults on police officers are not taken seriously.

In this way, a lesser sentence could encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a

"legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for

the law").

### D.    The Need for the Sentence to Afford Adequate Deterrence

---

[6] Federal Bureau of Investigation Director Christopher Wray, Statement before the House
Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"),
available at:

https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf.

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

### General Deterrence

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B).   The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[7] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. The violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble.   The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification.   It is a damage that will persist in this country for decades.

Tr. at 69-70.   Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence.   This was not a protest.   *See id.* at 46

---

[7] *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.").   And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences.   There is possibly no greater factor that this Court must consider.

### Specific Deterrence

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.   First, although Neefe has a criminal history category of I, his history of possessing firearms and ammunition while being a user of controlled substances (potentially a violation of federal law), planning to bring a military-style knife to a political rally in Washington in November 2020, and engaging in violent, extremist rhetoric shows a clear pattern of alarming, possibly illegal behavior and violent ideations.   *See* Section VI(B) *supra.*   Second, while he admitted to the FBI that his conduct was "wrong" and expressed some remorse after he was arrested, Neefe's actions immediately following the Capitol riot belie his postarrest assertions.   His social-media statements on the night of January 6 were those of an unrepentant man girding for another battle.   *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol.   It didn't come when he went home.   It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day.   It came when he realized that he could go to jail for what he did.   And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).   Neefe's own statements that he would "bring[] a gun next time" and his desire

for "cop[s]" to "be lined up and put down" demonstrate that his sentence must be sufficient to provide specific deterrence from committing future crimes of violence, particularly in light of his history of extremism and violent rhetoric.

### E.      The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m).   In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108.   Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.   As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3.   More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines).   Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case.   Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that

sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that "significantly increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

### F.    Unwarranted Sentencing Disparities

Finally, as to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing disparities—the crimes that the defendant and others like him committed on January 6 are unprecedented. These crimes defy statutorily appropriate comparisons to other obstructive related conduct in other cases. To try to mechanically compare other § 1512 defendants before January 6, 2021, would be a disservice to the magnitude of what the riot entailed and signified.

As noted above, Neefe pleaded guilty to Conspiracy to Obstruct an Official Proceeding under 18 U.S.C. § 1512(k) (Count One) and Assaulting, Resisting, or Impeding Certain Officers and Aiding and Abetting under 18 U.S.C. §§ 111(a)(1) and 2 (lesser included offense of Count Four). As of the date of this sentencing memorandum, no other Capitol rioter had been sentenced

for the conspiracy offense under 18 U.S.C. § 1512(k).   But four defendants so far have been sentenced for committing the substantive offense under § 1512(c)(2) in addition to a violation of § 111(a)(1), and each received sentences of incarceration ranging from 33 to 51 months.[8]

First, in *United States v. Matthew Miller,* 12-cr-00075 (RDM), the court sentenced the defendant to 33 months in prison.   While on the Capitol grounds, Miller, a 22-year-old, threw a full beer can in the direction of police officers.   After watching other rioters repeatedly assaulting officers in the Lower West Terrace entrance to the Capitol—commonly referred to as the "tunnel," the site of a prolonged siege and countless attacks on officers lasting over three hours—Miller chose to join them.   He encouraged rioters to push against the police lines formed to keep the mob from entering, then unleashed the contents of a fire extinguisher directly onto officers in the tunnel. The court varied downward two levels—citing Miller's youth and his intoxication during the riot— and imposed 33 months in prison as well as 24 months of probation concurrent to a period of supervised release.

At the time of his offenses on January 6, 2021, Neefe was two years older than Miller. Even assuming that voluntary intoxication is a mitigating factor at sentencing, there is no indication Neefe was intoxicated when he stormed the Capitol.   Indeed, he appeared quite sober throughout his criminal conduct that day.   There is no reason to vary downward here.

Second, in *United States v. Greg Rubenacker,* 1:21-cr-00193 (BAH),[9] the court sentenced the defendant to 41 months in prison.   Rubenacker was one of the first people to breach the

---

[8] Each of these defendants, like Neefe, had a criminal-history category of I.

[9] Rubenacker pleaded guilty to all nine counts in his superseding indictment without a plea agreement.   They were violations of 18 U.S.C. § 1512(c)(2), 18 U.S.C. § 111(a)(1), 18 U.S.C. § 231(a)(3) (Civil Disorder) and six misdemeanors.   The additional charges of conviction did not affect the Guidelines range of 41-51 months, which is also the correct range for Neefe.

Capitol, entering the Senate Wing Doors within 60 seconds of the initial breach of the building. Inside, he and other rioters chased USCP Officer Eugene Goodman through part of the Capitol, ignoring the officer's extended baton and repeated demands to "back up," and accosted other officers.   Rubenacker left the building, only to breach it again elsewhere.   This time, he pushed down the Senate Hall toward the Senate Chamber before being repulsed again by police deploying pepper spray.   Retreating to the Rotunda, Rubenacker refused to leave and confronted multiple officers, screaming that they were "communists."   When officers formed a line to force rioters out, Rubenacker swung a water bottle at one officer's head and threw liquid at other officers who were engaging with another rioter.   Only after an officer sprayed a chemical irritant in Rubenacker's face did he finally leave the Capitol, over one hour after he initially breached the building.   Following the riot, Rubenacker posted comments to videos on social media in which he did not show remorse ("America is pissed") and exuded pride for his participation in the riot ("Holy shit! This is history! We took the Capitol!").

While Rubenacker's conduct was deplorable, Neefe's conduct was more aggravating. Neefe engaged in preplanning with a coconspirator; fashioned the wooden club, a deadly weapon, specifically for January 6 and brought it to the Capitol; and joined others in assaulting multiple officers with another dangerous weapon, the large metal sign frame.   Further, he threatened additional violence, which Rubenacker did not do.   Therefore, Neefe deserves a midrange sentence of 46 months as opposed to Rubenacker's low-end sentence of 41 months.

Third, in *United States v. Scott Fairlamb,* 1:21-cr-00120 (RCL), this Court sentenced the defendant to 41 months in prison.   Fairlamb joined the storming of the police line on the West Terrace, obtained a police baton, and screamed, "What Patriots do? We fuckin' disarm them and

36

then we storm the fuckin' Capitol!"   Fairlamb brandished that same police baton while entering the Capitol through the Senate Wing Door, which had been kicked out by rioters only one minute before his entry. Fairlamb spent under 10 minutes inside the building.   After exiting, he aggressively followed a line of dramatically out-numbered MPD officers and screamed vitriol at them.   He isolated one of the officers, shoved him, then punched his face shield.   Two days after the riot, on January 8, 2021, Fairlamb filmed an ominous video, later seized from his cellphone, that threatened future violence, in which he stated, "they pulled the pin on the grenade, and the blackout is coming.   What a time to be a patriot."   Immediately after FBI agents visited him on January 15, 2021, he said that he would "go again" to the Capitol.

Both Fairlamb and Neefe showed no remorse shortly after the Capitol riot and threatened future violence.   Fairlamb filmed the ominous selfie video, while Neefe told others about how he would "bring[] a gun next time" and opined the officers at the Capitol should be "lined up and put down."   While Fairlamb played a more direct role in assaulting an individual police officer and harassing other officers, Neefe participated in an assault of multiple officers—albeit for a short time—with a dangerous weapon that posed greater potential for serious injury or worse.   In addition, Neefe engaged in more extensive planning with a coconspirator, fabricated a weapon that he brought to the Capitol, and spent a significant time—over 40 minutes—inside the building. Therefore, Neefe warrants a slightly lengthier sentence.

Fourth, in *United States v. Duke Wilson,* 1:21-cr-00345 (RCL), this Court sentenced the defendant to 51 months in prison.   Wilson, like Miller, attempted to gain entrance to the Capitol through the doors at the Lower West Terrace tunnel.   Dozens of officers in riot gear were protecting that entrance, and upon seeing the mob approaching, officers attempted to close and

lock the doors.   Before they could, Wilson lunged toward the door and prevented it from closing, allowing other rioters to help pry it open and attack officers.   Soon after, dozens of individuals, including Wilson, punched, shoved, and kicked officers and attempted to steal their riot shields. Officers responded, in part, by spraying the crowd of rioters with a chemical irritant in an effort to force them to leave the area.   Undeterred, Wilson picked up a several-feet-long white cylindrical object, believed to be a thin polyvinyl-chloride ("PVC") pipe, and indiscriminately struck at the officers with it, hitting one officer.   After assaulting that officer with the thin PVC pipe, Wilson threw it into the crowd of officers, striking another officer.   Wilson spent approximately 14 minutes in the tunnel.

Wilson's participation in the infamous siege at the tunnel, including his principal involvement in the assaults of two officers and wanton disregard for officers' safety, was self-initiated, longer, and more involved than Neefe's briefer participation in the sign assault.   Though Neefe engaged in planning with a coconspirator, made a weapon to bring to the Capitol, and issued appalling statements about the officers defending the Capitol on the evening following the riot, Wilson's conduct was more egregious, and he was more deserving of a high-end sentence within the applicable Guidelines range of 41-51 months.

Accordingly, a sentence of 46 months for Neefe would not create an unwarranted disparity.[10]

_____

[10] Attached to this sentencing memorandum is a table (current as of August 9, 2022) providing additional information about the sentences imposed on other Capitol breach defendants.   That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[11] *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011).   Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990), identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2), and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b).   At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The victims in this case, Officers M.B., J.C., and N.S., did not suffer bodily injury as a result of Neefe's assault. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Neefe must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role Neefe played in the riot on January 6.[12]

---

[11] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here.   *See* 18 U.S.C. § 3663A(c)(1).

[12] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA.   *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

(ECF 66 at 8-9.)   Neefe's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol.

## VIII.   FINE

Neefe's convictions under Sections 111 and 1512 subject him to a statutory maximum fine of $250,000.   *See* 18 U.S.C. § 3571(b)(3).   In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d).   The government is not requesting a fine here, as Neefe does not appear to have adequate resources to pay a fine in addition to his restitution obligation under the plea agreement, and agrees with the USPO's recommendation against imposing a fine.   (PSR at 17.)

## IX.   CONCLUSION

For the reasons set forth above, the government recommends that the Court sentence Neefe to 46 months in prison, which is a mid-range sentence within the Guidelines calculation that the parties agreed upon in the plea agreement, restitution of $2,000, and the mandatory $100 special assessment for each count of conviction.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:   /s/ *Seth Adam Meinero*
SETH ADAM MEINERO
Trial Attorney (Detailee)
D.C. Bar No. 976587
202-252-5847
seth.meinero@usdoj.gov

40

/s/ *Courtney Lee*
COURTNEY LEE
Assistant United States Attorney
D.C. Bar No. 241291
202-252-7650
courtney.lee@usdoj.gov

United States Attorney's Office for the
  District of Columbia
601 D St., N.W. - Room 4.12
Washington, DC 20530

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on August 10, 2022, I served a copy of this pleading on all parties to this matter as indicated in the Court's electronic case files system.

/s/ *Seth Adam Meinero*
SETH ADAM MEINERO
Trial Attorney (Detailee)

41