## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **v.** | : | **Case N. 22-CR-567 (RCL)** |
| | : | |
| **MARSHALL NEEFE,** | : | |
| Defendant. | : | |

### SENTENCING MEMORANDUM ON BEHALF OF MARSHALL NEEFE

Marshall Neefe ("Mr. Neefe") submits this sentencing memorandum in support of his request for a sentence of 12 months' incarceration. Although his conduct is indeed serious, it represents the only legal transgression this hard-working person has ever committed. It is also significant to note that his actions were not motivated by any desire for personal financial gain or any other type of benefit. Rather, his actions, which he himself admits were reprehensible, were motivated by a misunderstanding as to the facts surrounding the 2020 election. Indeed, Mr. Neefe knew next to nothing about the 2020 election and listened to sources of information that were clearly false. Mr. Neefe has learned valuable life lessons from this incident, and he will never repeat the actions that bring him before the Court in this case. For the reasons set forth in greater detail below, we request a 12-month sentence because we believe it to be "sufficient, but not greater than necessary" to achieve the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

As explained in greater detail below, Mr. Neefe was one of thousands of protestors who walked to the U.S. Capitol Building on January 6, 2021, after former U.S. President Donald J. Trump asked his supporters to march towards the U.S. Capitol Building in protest of the 2020

presidential elections and "fight" on his behalf.  This represents one of the saddest episodes in American history.  There remain many grifters[1] out there who remain free to continue propagating the "great lie" that Trump won the election, Donald Trump being among the most prominent.  Mr. Neefe is not one of these individuals; he knows he was wrong.

Mr. Neefe has pled guilty and admitted his violation.  He has no prior criminal record, and he has fully admitted his role.  His sentencing guideline range is 41 months to 51 months.  However, this is a case where the guidelines themselves should be discarded since they fail to take into account Mr. Neefe's unique personal attributes.  In fact, the defense argues that under all of the 18 U.S.C. 1335(a) factors, a sentence of 12 months' incarceration would be appropriate in this case.

## I.      FACTUAL BACKGROUND

Mr. Neefe was a law-abiding citizen and a family man before the instant offense.  His life was characterized by hard work and dedication.

Prior to his detention, Mr. Neefe lived with his former fiancé and 4-year-old son in Newville, Pennsylvania.  His life was centered around his family, whom he loves and cares for very deeply.  The letters appended hereto from his family members and friends, show that he has touched their lives very deeply by supporting them and providing for them in any way possible.

### A.      Marshall Neefe's Family Background

Mr. Neefe was born on July 10, 1996, in Crawford County, Pennsylvania. PSR ¶ 71.  He

---

[1] It is noteworthy that just two weeks ago, Steve Bannon was convicted of two counts of Contempt of Congress.  After his conviction, he used his Podcast to call for 4,000 "shock troops" to "deconstruct" the Government.  Mr. Bannon is a far more dangerous individual than Mr. Neefe; however, even if he is sentenced to the maximum sentence for both counts, he still only faces 12 months' incarceration. *See* 2 U.S.C. § 192.

was two weeks old when his parents, James Arthur Neefe and Julia Ann Neefe adopted him and raised him in a loving home. *Ibid.* Mr. Neefe describes his upbringing as "pretty wonderful". *Id.* ¶ 73. Mr. Neefe's father is 62 years old and is the owner of Stone Creek Builders, Inc. in Mount Holly Springs, Pennsylvania; his mother is 59 years old and is employed as medical billing representative for a chiropractor in Carlisle, Pennsylvania. *Id.* ¶ 72. Mr. Neefe has a very close relationship with his parents, as well as his adopted brother Cody James Neefe, who is 21 years old and lives with his parents in Mount Holly Springs. *Ibid.* Cody is a driver for Hawkins Water Tech Company. *Ibid.*

Mr. Neefe has never married but planned to marry his former fiancé and mother of his child, Victoria Dumond, prior to the instant offense. *Id.* ¶ 75. Mr. Neefe and Ms. Dumond were in a relationship for eight years; however, due to Mr. Neefe's incarceration and Ms. Dumond's struggles to care for their son without Mr. Neefe's help—financially and otherwise—the relationship ended. *Ibid.* Mr. Neefe's son has a processing disorder and attends a special school. *Ibid.* He struggles with words and instructions, and loud noises overwhelm him. *Ibid.* Ms. Dumond was unable to satisfy her son's special needs on her own and moved back into her parents' home to seek help from them. Mr. Neefe was devastated by the fact that he was unable to provide for his family, that his relationship ended, and his family was broken up because of his actions.

Mr. Neefe grew up in a household where love, respect, and hard work were the pillars of his upbringing. He has always been very generous and kind in the relationships that he maintained with his friends and family members and maintains daily contact with his parents and brother.

### B.      Marshall Neefe's Educational and Professional Background

Mr. Neefe attended Bolling Springs High School in Bolling Springs, Pennsylvania, in

2014. PSR ¶ 90.  At the time, his parents had just moved, and Mr. Neefe was a new student with

no friends. *Ibid.*  It was difficult for him to adapt, and he decided to withdraw from school in the

11th grade. *Ibid.*  After withdrawing from high school, Mr. Neefe enrolled at IMPCT institute in

Kendallville, Indiana, and obtained his General Educational Development and certificate in

welding in 2014. *Id.* ¶ 91.  Mr. Neefe also obtained a welding certification from the American

Welding Society in February 2015, which has since expired. *Ibid.*

The importance of hard work was instilled in Mr. Neefe at a young age.  During the

summer of 2015, when Mr. Neefe had just turned 19 years old, he worked for LPI LaGrange in

Fremont, Indiana. *Id.* ¶ 93.  He worked for five months and earned $11.50 hourly. *Ibid.*  In

December 2015, Mr. Neefe secured a job as a Lube Tech in the automotive department at Wal-

Mart in Indiana. *Id.* ¶ 94.  He left this employment after three months because he did not enjoy

working there. *Ibid.*  From 2016 until September 8, 2021, Mr. Neefe was a laborer at ONR

Construction in Newburg, Pennsylvania. *Id.* ¶ 95.  He earned $18.75 hourly and left ONR

Construction to spend more time with his son. *Ibid.*  Mr. Neefe started working for Filson Water,

LLC, in Carlisle, Pennsylvania on September 4, 2021, where he remained employed until his

incarceration. *Id.* ¶ 96.  He earned $16.50 hourly as a driver. *Ibid.*  Mr. Neefe intends to return to

his employment at Filson Water, LLC, upon his release, and Filson Water is willing to take him

back.[2]

---

[2] It is noteworthy that Filson Water is an Amish owned company which would greatly enhance
Mr. Neefe's rehabilitation and reentry into society.  The Amish are an Anabaptist religious sect
that migrated from Germany and Switzerland to Pennsylvania in the 17th and 18th centuries.
They tend to separate themselves from modern society, and have successfully preserved a

### C.        Marshall Neefe's Arrest

In September 2021, Mr. Neefe was arrested for the present offense.  On January 6, 2021,
Mr. Neefe travelled to the District of Columbia in order to attend a rally in support of former
U.S. President Donald J. Trump.  During these demonstrations, President Trump asked his
supporters to march towards the U.S. Capitol Building in protest of the 2020 presidential
elections and "fight" on his behalf.  Alongside thousands of other members of the crowd, Mr.
Neefe walked to the U.S. Capitol Building and entered the building.

Mr. Neefe had no larger role in the planning or organization of the protests or the rioting
that ensued in and around the Capitol Building.  ***In fact, Mr. Neefe has never been a person
who has been motivated by politics; he has never even cast a vote in any election and is not
registered to vote.*** Mr. Neefe's Voter Registration Status is attached hereto as <u>Exhibit "A"</u>.

As his family and friends state, Mr. Neefe was influenced by false information which was
spread by certain politicians and certain media outlets, and especially by co-defendant Charles
Bradford Smith, whom Mr. Neefe considered a close friend prior to the instant offense:

- "After returning home from the January 6th event, I noticed [Mr. Neefe] broke
  off all communications with his so-called friends, shut down social media and
  just concentrated on his family.  I remember him telling me everything on social
  media was a lie and that he was so sorry for believing all the hype pushed by his
  friends and social media." Letter from James Neefe.

- "Marshall has a melancholic personality and a low self-esteem which drove him
  to choose some friendships that are not good for him.  He always talks a "big
  talk" to make himself feel tough to fill a void in his life.  One such friendship
  pushed him to the January 6th rally in DC, where the hype, social media and
  event speakers sparked the massive crowds." Letter from Julie Neefe.

- Mr. Neefe "was very stressed out about all the rumors of fake ballots and [*sic*]
  election fraud.  He spent a lot of time on a messaging app where there was a lot

---

traditional, family-oriented lifestyle in the face of an ever-changing world.  Pacifism is at the
center of Amish religious belief which leaves no room for violence of any type.  Mr. Neefe's
association with Filson Water would have a very positive influence on his life.

of people posting stuff that likely wasn't real." Letter from Jeremiah Zook.

- "I believe he was heavily influenced by Brad Smith in his decision-making that day. I have never been a fan of Brad, he was irrational at times and his views were far from what anyone would consider normal. Brad is the kind of guy that wants to see the world burn. Without a doubt Marshall would not have been there if it wasn't for Brad. He probably just wanted to appease his friend and ended up going with no real intentions that day. Like I said he would do anything for his friends, even if it was not in his best interest." Letter from Hunter DeAngelo.

- Mr. Neefe "is very open and honest about himself and never once alone has he ever brought up politics. I have never known Marshall to be a political person unless Brad Smith was around. … I believe his actions on January 6th were heavily influenced by others because Marshall would do anything to seem cool to his friends. I believe that he went to the Capitol just to go with the flow of it and got caught up in the moment." Letter from Tyler Nastelli.

- "Unfortunately, I also found Marshall to be an easily impressionable young man who sometimes thought he knew more than his peers, even sometimes more than his parents. I believe this trait and Marshall's need for recognition caused him to exercise an extreme, if not supreme, lack of judgment when he decided to participate in the insurrection at the Capitol that day." Letter from Brian Champaign.

*See* Reference Letters attached hereto as Exhibit "B". Mr. Neefe now understands that the information he obtained was false and that the presidential election was not fraudulent.

Mr. Neefe accepts responsibility for his wrongdoing and is sincerely remorseful for his conduct. He is committed to facing the consequences of his actions and rebuilding his life after making a big mistake. He is deeply sorry for his actions and looks forward to expressing remorse at the upcoming hearing.

### D.     Marshall Neefe is the Quintessential Family Man

Mr. Neefe was raised by his parents in Pennsylvania, who instilled in him positive values and the relevance of hard work. As a dedicated and caring partner, son, brother, co-worker and neighbor he has always exhibited values of modesty, kindness, humanity, diligence, sincerity, honesty, reliability, nobility, and love for his family and others, as attested by his family and

friends. *See* Ex. "B".

Julie and Ronn Page, Mr. Neefe's paternal aunt and uncle, observed Mr. Neefe to always be "devoted to his friends and family." *Id.*, at 3. They recall that when Mr. Neefe was only 16 years old, he met and fell in love with the mother of his son, Victoria Dumond. *Ibid.* "When [Ms. Dumond] decided to leave Pennsylvania and go back home to Michigan to be with her family, Mr. Neefe followed her, he was only 17 years old. After a few months, this arrangement was not working out for Mr. Neefe. He made the most important phone call of his life. He called [his Aunt Julie and Uncle Ronn]. He wanted to move to Indiana to live with [them] and straighten out what had gone wrong." *Ibid.* While living with his aunt and uncle, Mr. Neefe "was always willing to help [them] out on [their] farm no matter what the chore. He enjoyed the animals and spent much of his off time with them. He also enjoyed going to work with [his aunt] and visiting with the residents [*sic*] of the nursing home, they enjoyed him very much." *Ibid.*

Mr. Neefe's father describes Mr. Neefe as "a peaceful, kind and respectful man. If he had a friend in need, he was there to lend a hand, change a flat tire or shovel snow." *Id.*, at 1. His father instilled in Mr. Neefe "a good work ethic at a young age." *Ibid.* As a child, Mr. Neefe "loved to come on [his father's] jobsite to 'help [him] build'". *Ibid.* As an adult, Mr. Neefe's "work ethic exceeded [his father's] expectations when he was hired by one of [his] sub-contractors on an Amish framing crew. He not only worked a grueling 8-hour day framing but also had to pick up and drop off his Amish crew each day. His day started at 4:30 am and ended at 6:30 pm, he never missed a day of work in 5 years. He always provided for his family and loves his 4-year-old son [] so much." *Ibid.*

Mr. Neefe's mother also notes that Mr. Neefe "is not a violent person and would never hurt anyone. He is an 'old soul' that is kind and compassionate." *Id.*, at 2. She further explains

that, prior to the instant offense, Mr. Neefe "has never broken the law and has always had respect for law enforcement and has never shown violence in any way." *Ibid*.

Mr. Neefe's former neighbor and family friend, Brian Champaign, who is a civilian government employee with the Department of the Navy and who has known Mr. Neefe since he was 13 years old, found Mr. Neefe to be an "affable young man who gained [his] trust" after he performed several odd jobs for him and purchased his old vehicle on a payment schedule that he never missed. *Id.*, at 10. Mr. Champaign states that based on his experience in law enforcement, in his nearly 25-year career in law enforcement, "[he] unfortunately encountered many persons who had committed various crimes to be incorrigible and incapable of learning from their mistakes in life. [He] sincerely believe[s] in [his] heart of hearts that [Mr. Neefe] is not one of those persons." *Ibid.*

Another family friend, Timothy Costello, also states that "[Mr. Neefe] and his entire family are good responsible people in [their] community" and that Mr. Neefe "was always a hard worker." *Id.*, at 4. Many of his former co-workers and employers also vouched for Mr. Neefe's impeccable work ethic. The president of Americomm LLC, William Scruggs, who had hired Mr. Neefe's employer to perform work for him, recalls that Mr. Neefe "always has a pleasant smile and attitude. [He] found [him] very polite and efficient in work, and his on-the-job demeanor [*sic*] uplifting [*sic*]." *Id.*, at 6.

Similarly, Mr. Neefe's former co-worker at O&R Construction, Chris King, believes that Mr. Neefe is a "great guy to work with", that he is "hard working" and has a "great personality". *Id.*, at 9. He recalls that at the company they used to call Mr. Neefe "the lift" because if there was anything heavy to lift, they would call Mr. Neefe to help them. *Ibid.* Another former coworker at the same company, Jeremiah Zook, also remembers Mr. Neefe to be "a safe and

dependable driver, and a good worker." *Id.*, at 7.  He experienced Mr. Neefe to be "very easy to get along with and [as someone who] would do anything for his friends." *Ibid.*  The owner of the company, Omar King, also found Mr. Neefe to be "a great guy to work with" and someone who "worked hard" and "had a positive attitude". *Id.*, at 5.  More importantly, he also notes that Mr. Neefe "[n]ever showed any violence." *Ibid.*

In addition to being a hard worker and a genuinely good family man, Mr. Neefe's mother expresses how much "joy and laughter", Mr. Neefe brought to them. *Id.*, at 2.  "At an early age [Mr. Neefe] showed the love for music and art.  He had a natural ability to play music and played saxophone in a band during his school years.  He then taught himself how to play the piano and guitar and he also has a wonderful singing voice.  He played some sports but his passion has always been music and art." *Ibid.*  His aunt also recalls that Mr. Neefe "showed talents in music and writing at a very young age. *Id.*, at 3.  He would play the organ with his grandmother and later mastered the saxophone.  He participated in the school's concert and marching bands.  Also taught himself to play the guitar.  He demonstrated an articulation for drawing skills and poetry." *Ibid.*

Similarly, his friends describe Mr. Neefe as reliable and kind.  His friend, Hunter DeAngelo, recalls the first time he met Mr. Neefe approximately eight years ago when Mr. Neefe "made it feel as if [they] were best friends for a long time." *Id.*, at 11.  He states that "[i]t did not matter to him that [they] just met, he showed [him] his real self with open arms" because "[t]hat is the kind of person [Mr. Neefe] is—"very kind, welcoming, joyful and respectful." *Ibid.*  Mr. DeAngelo "cherished" that Mr. Neefe "always has an open door for his friends." *Ibid.*  In fact, Mr. DeAngelo recalls that he has "some of [his] best memories of [his] young adult life over at [Mr. Neefe's] house." *Ibid.*  Mr. Neefe "knows how to pick you up when you are feeling down

and genuinely wants the best for his friends." *Ibid*.

Mr. Neefe's best friend of twelve years, Tyler Nastelli, also states that Mr. Neefe "is one of the most reliable people [he] has ever met in [his] life." *Id.*, at 14.  Mr. Neefe "was there for [Mr. Nastelli] the moment [his] father passed away." *Ibid.*  He helped Mr. Nastelli around the house, taught him how to fix things himself and stood by to listen and talk with Mr. Nastelli when he needed. *See id.*  Mr. Neefe "has always been the type of friend you could call, and he would drop everything to help you." *Ibid.*

Mr. Neefe's other friend, Jacob Young, agrees that Mr. Neefe "has always been one of the few people that will always be around when you need him." *Id.*, at 12.  Mr. Neefe "would just come around to [*sic*] help [him] repair [his] car or just work around the house to help get a few things off of [his] to do list.  [Mr. Neefe] would give anyone the time of day if they asked for it, and would never bat an eye to help someone in need.  He holds his son [] above everything else, and anyone would be able to see that just from having a good conversation with him." *Ibid.*

Finally, Mr. Neefe's friend, Ryan Heishman, states that "[e]very interaction [he has] had with him has been nothing but a positive experience.  In [his] opinion [Mr. Neefe] is a good natured person who cares about those close to him.  [Mr. Neefe] has everyone's best interests in mind, and [he has] never seen him behave in an inappropriate manner." *Id.*, at 13.

## II.    ADVISORY GUIDELINE RANGE

The Probation Officer has calculated an advisory guideline range of 41 months to 51 months, resulting from a total offense level of 22 and Criminal History Category I.  The plea agreement also sets forth a sentencing guideline range of 41 months to 51 months.  The guideline range offers no useful advice because it (1) is the product of a guideline that is not based on empirical evidence or national experience; (2) fails to take any account of Mr. Neefe's

culpability or low risk of recidivism; (3) would result in unwarranted disparity as compared with sentences for similarly situated Defendants; and (4) is far greater than necessary to promote the goals of sentencing in this case.

The guideline range, however, is only one of the factors the Court must consider under 18 U.S.C. 1335(a).

## III.    A SENTENCE OF 12 MONTHS' INCARCERATION WOULD BEST SATISFY THE GOALS OF §3553(a).

The Court must " impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)," which are "the need for the sentence imposed

(A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)    to afford adequate deterrence to criminal conduct;

(C)    to protect the public from further crimes of the defendant; and

(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."

18 U.S.C. § 3553(a)(2).  In "determining the particular sentence to be imposed," the Court must consider these purposes, the nature and circumstances of the offense and the history and characteristics of the defendant, the need to avoid unwarranted disparities, and the need to provide restitution to any victims of the offense.  *See* 18 U.S.C. § 3553(a)(1)-(7).

No workable guideline could ever "account for many of the myriad factors that are properly considered in fashioning just sentences." *See United States v. Ovid, slip op*., 2010 WL 3940724, *1 (E.D.N.Y. 2010).  A substantial variance is needed in this case because of the

11

following mitigating factors, all of which are highly relevant to the purposes of sentencing and none of which are taken into account by the guideline range.

> **A.      The Guidelines are not Based on Empirical Evidence or National Experience and Fails to Promote any Purpose of Sentencing.**

When Congress enacted the Sentencing Reform Act of 1984, it directed the Commission to promulgate guidelines that assure the meeting of the purposes of sentencing, 28 U.S.C. § 991(b)(1)(A), and to use average sentences imposed and prison time actually served in the pre-guidelines period as a "starting point". 28 U.S.C. § 994(m).  The Commission was then to continually review and revise the guidelines in light of sentencing data, criminological research, and consultation with frontline actors in the criminal justice system. *See* 28 U.S.C. § 991(b)(1)(C), § 991(b)(2), § 994(o), § 995(13), (15), (16).

The original Commissioners abandoned the effort to design the guidelines based on the purposes of sentencing because they could not agree on which purposes should predominate, and instead purportedly based the guidelines on an empirical study of time served for various offenses before the guidelines. *See* USSG, Ch. 1 Pt. A(3); Justice Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*,17 Hofstra  L. Rev. 1, 7 (1988).

In *Rita v. United States*, 551 U.S. 338 (2007), the Supreme Court gave two reasons that it may be fair to assume that the guidelines reflect a rough approximation of sentences that "might achieve§ 3553(a)'s objectives."  First, the original Commission used an "empirical approach" which began "with an empirical examination of 10,000 presentence reports setting forth what judges had done in the past."  Second, the Commission can review and revise the guidelines based on judicial feedback through sentencing decisions, and consultation with other frontline

actors, civil liberties groups, and experts. *Id*. at 348-50.

The Court recognized, however, that not all guidelines were developed in this manner. *See Gall v. United States*, 552 U.S. 38, 46 & n.2 (2007); *Kimbrough v. United States*, 552 U.S. 96 (2007).  When a guideline "do[es] not exemplify the Commission's exercise of its characteristic institutional role, because the Commission "did not take account of 'empirical data and national experience,'" the sentencing court is free to conclude that the guideline "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purpose, even in a mine-run case." *Id*. at 109-10.

The guideline regarding offenses involving obstruction of official proceedings is not based on empirical data of past practice or on national experience since then.   Because the Commission failed to rely on empirical data or national experience in promulgating or amending § 2D1.1, and thus failed to fulfill its institutional role, this Court is free to disagree, on reasoned policy grounds, with its recommendation. *See Spears v. United States*, 129 S. Ct. 840, 843 (2009); *Kimbrough*, 552 U.S. at 101-02, 109-10; *Rita*, 551 U.S. at 351, 357.

**B.      Need for Just Punishment in Light of Seriousness of the Offense.**

The need for retribution is measured by the degree of "blameworthiness," which "is generally assessed according to two kinds of elements: the nature and seriousness of the harm caused or threatened by the crime; and the offender's degree of culpability in committing the crime, in particular, his degree of intent (*mens rea*), motives, role in the offense, and mental illness or other diminished capacity." Richard S. Frase, *Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment: "Proportionality" Relative to What?*, 89 Minn. L. Rev. 571, 590 (February 2005).  The guidelines include none of the factors bearing on Mr. Neefe's degree of culpability.

13

1.     **Marshall Neefe's Conduct was Aberrant.**

Mr. Neefe lived a law-abiding life until the instant offense began.  He did not engage in criminal conduct until he made a mistake which led to this offense.  His offense is completely uncharacteristic when viewed in the context of his entire productive adult life.  This Court must consider the aberrant nature of his conduct. *See, e.g., United States v. Howe*, 543 D.3d 128, 132 (3rd Cir. 2008) (variance based on "isolated mistake" in otherwise long and entirely upstanding life; *see also United States v. Hadash*, 408 F.3d 1080, 1084 (8th Cir. 2005) (Defendant was a "law abiding citizen, who [did]  an incredibly dumb thing"); *United States v. Davis*, 2008 WL 232920 (S.D.N.Y. 2008) (Defendant was a first offender who had worked throughout his 15-year marriage to educate his six children and whose offense was prompted by economic pressures).

2.     **The Seriousness of the Offense has been Partially Mitigated by Mr. Neefe's Assistance in Investigating and Prosecuting his Own Misconduct.**

Mr. Neefe assisted authorities in the investigation and prosecution of his own misconduct by timely notifying authorities of the intention to enter a plea of guilty.  Mr. Neefe's efforts demonstrate his genuine remorse and acceptance of responsibility.

C.     **Need for Deterrence.**

Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006).  "Three National Academy of Science panels ... reached that conclusion, as has every major survey of evidence." *Id.*; *see also* Zvi D. Gabbay, Exp*loring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447048 (2007) ("certainty of punishment is empirically known to be a far better

deterrent than its severity").

Typical of the findings on general deterrence are those of the Institute of Criminology at Cambridge University. *See* Andrew von Hirsch, *et al.*, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999). The report, commissioned by the British Home Office, examined penalties in the United States as well as several European countries. *Id.*, at 1. It examined the effects of changes to both the certainty and severity of punishment. *Id.* While significant correlations between sentence severity and crime rates ... were not sufficient to achieve statistical significance." *Id.* at 2. The report concluded that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects." *Id.* at 1.

According to "the best available evidence, ... prisons do not reduce recidivism more than noncustodial sanctions." Francis T. Cullen, *et al., Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011).

**D.     Need for Incapacitation.**

Mr. Neefe has an exceptionally low risk of recidivism. Mr. Neefe is a first offender, was employed throughout his adult life, had a long-term relationship of eight years with his former fiancé and mother of his child whom he intended to marry if it was not for his incarceration for the instant offense, and has a four-year-old son. For all male offenders in Criminal History Category I, the recidivism rate is 15.2%. *See* U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*. For those who have been employed, the rate is 12.7%; and for those who were ever married (or in a long-term relationship), the rate is 9.8%. *Ibid.* For those, like Mr. Neefe, who have been employed, had been in a long-term relationship, and have children, the recidivism rate would approach zero. *See*

*ibid.* Finally, offenders like Mr. Neefe with zero criminal history points have a rate of recidivism half that of offenders with one criminal history point. *See* Sent'g Comm'n, Recidivism and the "First Offender," at 13-14 (May 2004) [hereinafter First Offender].

The Commission has recognized the advisability of revising the guidelines to take first offender status into account. *See* First Offender, at 1-2 (identifying goal of "refin[ing] a workable 'first-offender' concept within the guideline criminal history structure").

In imposing the least sentence sufficient to account for the need to protect the public from further crimes of Mr. Neefe, this Court should consider the statistically low risk of recidivism presented by Mr. Neefe's history and characteristics. *See*, e.g., *United States v. Darway*, 255 Fed. Appx. 68, 73 (6th Cir. 2007) (upholding downward variance on a basis of Defendant's first-offender status); *United States v. Urbina*, slip op., 2-0 WL 565485, *3 (E.D. Wis. 2009) (considering low risk of recidivism indicated by Defendant's lack of criminal record, positive work history, and strong family ties); *United States v. Cabrera*, 567 F. Supp. 2d 271, 279 (D. Mass. 2008) (granting variance because  Defendants "with zero criminal history points are less likely to recidivate than all other offenders").

### E.    Need to Avoid Unwarranted Disparities and Unwarranted Similarities.

The Court must consider the need to avoid unwarranted disparities among defendants with similar criminal histories convicted of similar criminal conduct. 18 U.S.C. § 3553(a)(6). The court should avoid unwarranted similarities in sentencing among defendants who are different in ways not accounted for in the guideline range, see *Gall*, 552 U.S. at 55 ("need to avoid unwarranted similarities among other co-conspirators who were not similarly situated"); *United States v. Ovid*, 2010 WL 3940724 (E.D.N.Y. 2010) (sentencing two Defendants with similar guideline ranges to 60 months and 126 months respectively based on distinctions in

16

circumstances of the offenses and characteristics of the Defendants), and unwarranted differences among defendants whose conduct and characteristics are similar. *See United States v. Parris*, 573 F. Supp. 2d 744, 753, 756-62 (E.D.N.Y. 2008).

The chart below includes a sample of obstruction cases in which Defendants received sentences substantially below the guideline ranges applicable in those cases, and substantially below the guideline range of 41 months to 51 months applicable here.  This Court should take into account the national sentencing trend exemplified by this chart.

In *Parris*, Judge Block in the Eastern District of New York took a similar collection of cases into account in fashioning an appropriate sentence for two securities fraud offenders.  At the court's request, each party submitted a sample group of cases to illustrate the sentences imposed in other securities fraud cases. *Id*. at 752.  Based on these samples, the court concluded that "[t]hose [Defendants] who were not cooperators and were responsible for enormous losses were sentenced to double-digit terms of imprisonment (in years); [while] those whose losses were less than $100 million were generally sentenced to single-digit terms." *Id*. at 753.  The court relied on this national pattern in arriving at a sentence of 60 months for the two Defendants who faced an advisory guideline range of 360 months to life, which was 16.7% of the bottom of the applicable guideline range. *Id*. at 745.

Unlike the Defendants in *Parris*, who had no particular mitigating factors, there are substantial mitigating factors here.  The Court should impose a sentence of 12months' incarceration.

It is also important to consider other sentences imposed on defendants in the January 6th cases.  Below is a partial chart:

| Case | Conviction | Sentence Imposed |
|------|------------|------------------|
| *U.S. v. Paul Hodgkins*, 1:21-CR-00188-RDM (D.C. 2021) | 18 U.S.C. § 1512(c)(2) | 8 months' incarceration<br>24 months' supervised release<br>$2000 restitution |
| *U.S. v. Matthew Miller*, 1:21-CR-00075-RDM (D.C. 2021) | 18 U.S.C. § 1512(c)(2)<br>18 U.S.C. § 111(a)(1) | 33 months' incarceration<br>24 months' probation<br>$2000 restitution<br>100 hours community service |
| *U.S. v. Mark Leffingwell*, 1:21-CR-00005-ABJ (D.C. 2021) | 18 U.S.C. § 111(a)(1) | 6 months' incarceration |
| *U.S. v. Kevin Creek*, 1:21-CR-00645-DLF (D.C. 2021) | 18 U.S.C. § 111(a)(1) | 27 months' incarceration<br>12 months' supervised release<br>$2000 restitution |
| *U.S. v. Greg Rubenacker*, 1:21-CR-00193-BAH (D.C. 2021) | 18 U.S.C. § 231(a)(3)<br>18 U.S.C. § 1512(C)(2)<br>18 U.S.C. § 111(a)<br>18 U.S.C. § 1752(a)(1)<br>18 U.S.C. § 1752(a)(2)<br>18 U.S.C. § 1752(a)(4)<br>18 U.S.C. § 5104(e)(2)(D)<br>18 U.S.C. § 5104(e)(2)(E)<br>18 U.S.C. § 5104(e)(2)(F)<br>18 U.S.C. § 5104(e)(2)(G) | 41 months' incarceration<br>36 months' supervised release<br>$2000 restitution |
| *U.S. v. Scott Fairlamb*, 1:21-CR-00120-RCL (D.C. 2021) | 18 U.S.C. § 1512(c)(2)<br>18 U.S.C. § 111(a)(1) | 41 months' incarceration<br>36 months' supervised release<br>$2000 restitution |

## F.     Kinds of Sentences Available.

This Court must consider all of "the kinds of sentences available" by statute, §

3553(a)(3), even if the "kinds of sentence ... established [by] the guidelines" zones recommend

only a lengthy prison term. *See Gall*, 552 U.S. at 59 & n.11.  According to the Supreme Court's

decisions in *Gall* and *Kimbrough*, federal judges are free to consider relevant circumstances

related to an offense and the history and characteristics of a defendant, and are not tied to the rigid, arithmetic framework of the Guidelines.  Indeed, *Kimbrough* and *Gall* have returned sentencing courts to the "federal judicial tradition" of considering "every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify the crime and the punishment to ensue." *Gall*, 552 U.S. at 52; *see also United States v. Tornko*, 562 F.3d 558, 560 (3d Cir. 2009) ("The sentencing judge is in a superior position to find facts and judge their import under § 3553(a) in the individual case.").

Ultimately, the Court must "impose a sentence sufficient, but not greater than necessary" to comport with the goals of sentencing. *See United States v. Ollzovsky*, 562 F.3d 530, 552 (3d Cir. 2009).  Congress directed the Commission to "insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense," and the "general appropriateness of imposing a term of imprisonment on a person convicted of a crime of violence that results in serious bodily injury." 28 U.S.C. § 9940).

Congress issued this directive in the belief that "sentencing decisions should be designed to ensure that prison resources are, first and foremost, reserved for those violent and serious criminal offenders who pose the most dangerous threat to society," and that "in cases of nonviolent and non-serious offenders, the interests of society as a whole as well as individual victims of crime can continue to be served through the imposition of alternative sentences, such as restitution and community service." *See* Pub. L. No. 98-473, § 239, 98 Stat. 1987, 2039 (1984) (set forth at 18 U.S.C. § 3551 note).  Mr. Neefe is plainly not a "violent and serious offender" who "pose[s] the most dangerous threat to society".

**IV.      CONCLUSION**

At the time of Mr. Neefe's sentencing, this Court will be charged with imposing a sentence that is fair, but not "greater than necessary." 18 U.S.C. § 18553(a); *Kimbrough*, 552 U.S. at 101.  This bedrock principle of sentencing law cannot be fulfilled in Mr. Neefe's case if he is sentenced at or near the range proposed by the Guidelines.  Rather, as reflected by the data and analogous case law above, a sentence of 12 months is more appropriate in this case.

Mr. Neefe is a good man who is profoundly sorry for his transgressions.  He has learned from his mistake and accepted full responsibility for his actions.  He has no prior criminal history and is extremely unlikely to recidivate in this manner again.  Mr. Neefe plans to address the Court at his upcoming sentencing hearing to express his sincere remorse once again, and to assure the Court that he will never again break the law.

Date: August 10, 2022                         Respectfully Submitted,

                                              */s/ Dennis E. Boyle*
                                              _____
                                              Dennis E. Boyle, Esquire
                                              Blerina Jasari, Esquire
                                              Boyle & Jasari
                                              1050 Connecticut Ave, NW
                                              Suite 500
                                              Washington, D.C., 20036
                                              Email:  dboyle@dennisboylelegal.com
                                                        bjasari@dennisboylelegal.com
                                              Phone: (202) 430-1900

                                              *Counsel for Defendant*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 10th day of August 2022, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send an electronic notification of such filing to all counsel of record.

/s/ Dennis E. Boyle
Dennis E. Boyle, Esquire

21