```
 1                    UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
 2
       * * * * * * * * * * * * * * *    )
 3     UNITED STATES OF AMERICA,        )      Criminal Action
                                        )       No. 21-00567
 4                     Plaintiff,       )
                                        )
 5        vs.                           )
                                        )
 6     MARSHALL NEEFE and               )      Washington, D.C.
       CHARLES BRADFORD SMITH,          )      September 23, 2022
 7                                      )      2:41 p.m.
                       Defendants       )
 8     * * * * * * * * * * * * * * *    )

 9


10                 TRANSCRIPT OF SENTENCING HEARING
11          BEFORE THE HONORABLE ROYCE C. LAMBERTH,
                 UNITED STATES DISTRICT JUDGE
12


13
       APPEARANCES:
14
       FOR THE GOVERNMENT:      SETH ADAM MEINERO, ESQ.
15                              COURTNEY LEE, ESQ.
                                UNITED STATES ATTORNEY'S OFFICE
16                                FOR THE DISTRICT OF COLUMBIA
                                555 Fourth Street, Northwest
17                              Eleventh Floor
                                Washington, D.C. 20530
18

19     FOR THE DEFENDANT        DENNIS E. BOYLE, ESQ.
               NEEFE:           BLERINA JASARI, ESQ.
20                              BOYLE & JASARI
                                1050 Connecticut Avenue
21                              Suite 500
                                Washington, D.C. 20036
22

23     FOR THE DEFENDANT        PETER A. COOPER, ESQ.
               SMITH:           LAW OFFICES OF PETER A. COOPER
24                              400 Fifth Street, Northwest
                                Suite 350
25                              Washington, D.C. 20001
```

1    APPEARANCES, CONT'D:

2    FOR U.S. PROBATION:      AMI LANDON

3

     REPORTED BY:             LISA EDWARDS, RDR, CRR
4                             Official Court Reporter
                              United States District Court for the
5                               District of Columbia
                              333 Constitution Avenue, Northwest
6                             Room 6706
                              Washington, D.C. 20001
7                             (202) 354-3269

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1      (REPORTER'S NOTE:  ALL PARTIES WERE PRESENT IN THE COURTROOM

 2   FOR THIS PROCEEDING EXCEPTING JUDGE LAMBERTH, WHO APPEARED

 3   VIA ZOOM:)

 4              THE COURTROOM DEPUTY:  Your Honor, this is

 5   Criminal Case 21-567, the United States of America versus

 6   Marshall Neefe and Charles Bradford Smith.

 7              Will the parties please come forward to the

 8   lectern and identify yourselves for the record.  First we

 9   will start with Government counsel this afternoon.

10              MR. MEINERO:  Good afternoon, your Honor.  Seth

11   Adam Meinero for the United States.

12              MS. LEE:  And AUSA Courtney Lee for the United

13   States.

14              THE COURT:  All right.

15              MR. BOYLE:  Good afternoon, your Honor.  Dennis

16   Boyle and Blerina Jasari on behalf of the Defendant,

17   Marshall Neefe.

18              MS. JASARI:  Good afternoon, your Honor.

19              MR. COOPER:  Good afternoon, your Honor.  Peter

20   Cooper on behalf of Charles Smith, who is present here in

21   the courtroom.

22              THE COURT:  Okay.  Because of the delay in getting

23   this going, I want to tell you in advance, everybody just

24   take a breath.  Don't worry about it.  I do have another

25   matter I have to do at 4:00 that we'll just take a short
```

1    recess for.  But we will go through to completion on this.

2    I regret that I could not be there in person today, but my

3    doctor did not want to have me risk another fall and have me

4    come down in person.

5           I could put this over until I could be there in

6    person, but I thought everybody would just as soon get this

7    over with.  I wanted to go forward today if y'all want to go

8    forward today, and I know there was some travel involved.

9    So only if folks are willing to go forward will we go

10   forward today.

11          Let me ask first, I take it the Government is

12   willing to go forward.

13          Mr. Cooper, I take it Mr. Smith is willing to go

14   forward under these circumstances.

15          And, Mr. Boyle, you can answer as to your client

16   if you all want to go forward today.

17          I have read all of your memos that you all have

18   filed and all the papers, but I'm anxious to hear your

19   allocution on behalf of your client as well.

20          Mr. Cooper?

21          MR. COOPER:  Thank you, your Honor.

22          With respect to going forward today, yes, your

23   Honor.  We're willing to do that right now.

24          THE COURT:  Okay.  And Mr. Boyle?

25          MR. BOYLE:  Your Honor, we're willing and in fact

1    prefer to go forward today.

2          THE COURT:  Okay.  I'll let the Government

3    allocute first and then I'll hear from each Defendant in

4    turn before I decide on the sentence.

5          I think in the normal course of things I will

6    first say that, having reviewed the presentence report, I

7    would see if there's any disputes that either side wants to

8    raise as to the presentence report in each case that you

9    want me to resolve before I decide on the guidelines as set

10   forth by the probation office in the presentence report,

11   because we have to start there.

12         And then I would of course under the normal

13   procedures decide whether a guidelines sentence is

14   appropriate or whether a variation or departure from the

15   guidelines is appropriate.

16         Does the Government have any objection to the

17   report and the total offense level and the criminal history

18   category as set forth in the report?

19         MR. MEINERO:  Your Honor, the Government does not

20   object to the ultimate calculations and the ranges for both

21   Mr. Neefe and Mr. Smith.  We do not dispute where the

22   probation office came out on those calculations.  Thank you.

23         THE COURT:  Mr. Cooper?

24         MR. COOPER:  We have no objection to the guideline

25   range.  No, your Honor.

1          THE COURT:  And Mr. Boyle?

2          MR. BOYLE:  Your Honor, we have no objection to

3     the guidelines calculations.

4          THE COURT:  So the total offense level would be

5     22.  The criminal history category would be I in each case.

6     And in each case, the custody guidelines would be 41 to 51

7     months.  In each case, the supervised release guideline

8     would be one to three years.  In each case, probation would

9     be ineligible.  In each case, the fine guideline range would

10    be $15,000 to $150,000.  In each case, restitution would be

11    2,000.  And then in each case the special assessment

12    required to be imposed by the law will be $100 as to each

13    count.  So it would be a total of $200 required by law.

14          So with those guideline calculations, then, I'll

15    hear the allocution from each side as to what the proper

16    sentence would be.  The Government may go first.

17          MR. MEINERO:  Your Honor, with the Court's

18    permission, the Government was going to allocute first -- I

19    was going to allocute regarding Mr. Neefe.  My partner,

20    Assistant United States Attorney Lee, was going to allocute

21    for Mr. Smith.  With the Court's permission, that's how we

22    were going to proceed.

23          THE COURT:  That's fine.

24          MR. MEINERO:  Very well.

25          Your Honor, I'm going to share my PowerPoint, and

1    I hope that I have the technical acumen to do it correctly.

2            Your Honor, can you see the PowerPoint?

3            THE COURT:  Yes.

4            MR. MEINERO:  Very well.  I will start with a

5    general statement, your Honor.

6            The attack of the riot at the United States

7    Capitol on January 6th, 2021, was a singularly shameful

8    event in our nation's history.  What occurred there that day

9    was repugnant to our republic.  Every person who

10   participated, including Mr. Neefe and Mr. Smith, bears

11   responsibility for that assault on the rule of law and our

12   democratic values.

13           We'll turn first -- go through the sentencing

14   factors, your Honor, and we will turn first to the nature

15   and circumstances of the offense.

16           This will be the first sentencing for a conspiracy

17   to obstruct an official proceeding under 18 USC 1512(k)

18   related to the January 6th siege of the Capitol.  That

19   offense is reflected in Count 1.  And Mr. Neefe and

20   Mr. Smith are also being sentenced for Count 4, impeding,

21   resisting or assaulting law enforcement officers.

22           The Court is already quite familiar with

23   Mr. Neefe's case.  We had an extensive detention hearing in

24   February in which we shared a significant amount of evidence

25   with the Court regarding the conspiracy between Mr. Neefe

1    and Mr. Smith.  In sum, they engaged in extensive planning

2    on Facebook with the objective of ensuring that Donald Trump

3    would remain president when Congress met to certify the

4    Electoral College certification at the Capitol on January

5    6th, 2021, and they were prepared violently to ensure that

6    result.

7              We're not going to recount all the evidence we

8    shared before.  Instead, we'll just touch on some of those

9    pieces of evidence that -- some of the pieces of evidence

10   plus some evidence that the Court had not seen before.

11             First, regarding planning, the Co-Defendants

12   discussed bringing weapons to the Capitol on January 6th.

13   Mr. Neefe may be unique among Capitol defendants in that he

14   had a talent for woodworking, an enviable talent.  But

15   unfortunately, he used that talent for a corrupt purpose:

16   to fashion a billy club, an old-style police baton or billy

17   club, which he called the commie knocker, to bring to the

18   Capitol.  That's reflected in Neefe sentencing Exhibit 1-A.

19             In Exhibit 1-B, Mr. Neefe engaged in a

20   conversation on Facebook regarding his weapon.  He called it

21   the commie knocker.  He said:  Getting prepped for the 6th,

22   LOL, meaning laughing out loud.  He said:  Going to D.C. to

23   make sure them little bitches don't burn down the city when

24   Trump is announced as president.

25             Exhibits 1-C and 1-D show Mr. Neefe at the Capitol

1    with the commie knocker wooden club.  In Exhibit 1-C, he had

2    the club to which he attached an American flag tucked in his

3    Ogio backpack.  In Exhibit 1-D, he's pictured with

4    Mr. Smith.  That's shortly after they cross over into the

5    Capitol and restricted ground.  And they're smiling after

6    they crossed over into the grounds.

7         When they crossed over into the grounds, they

8    cemented their conspiracy.  Mr. Smith exclaimed:  We are

9    literally storming the Capitol.  And Mr. Neefe raised his

10   arm in an affirmative gesture, holding that wooden club in

11   his right hand.  That picture is in our sentencing memo.

12        After positioning themselves in front of the

13   Capitol's lower west terrace on the west front of the

14   Capitol, they both participated in an assault of a defensive

15   line of police officers with another dangerous weapon, a

16   large sign frame supporting an oversized Trump sign that was

17   heavy, welded together and which one officer in the

18   defensive life said could have split someone's head open.

19        In Exhibit 1-E, we're going to play a short

20   portion of the video showing that assault.

21        (Whereupon, segments of Government's Exhibit No.

22   1-E were published in open court.)

23        MR. MEINERO:  Here are some screenshots from that

24   video, your Honor.  As you can see, this large all-metal

25   sign frame, which was at least 8 by 10 feet in size, is

1    welded together with screws which one officer said it took

2    about 15 officers to cast aside after it had been pushed

3    into that line.

4            Exhibit 1-F, a screenshot from that video, shows

5    Mr. Neefe outlined in yellow and his right hand is

6    supporting that sign frame as it moves forward.

7            Mr. Neefe then advanced forward into an elevated

8    area where the defensive line was positioned.  In

9    Exhibit 1-G, he's also outlined in yellow at the top of the

10   steps to that elevated area.  He retreated when he was

11   repelled back by officers with pepper spray.

12           And Exhibit 1-A is another sequential photo of

13   Mr. Neefe being driven down the stairs after he had been

14   sprayed.

15           This incident, your Honor -- there's another angle

16   of this incident, which we'll show.  This was reflected in

17   Exhibit 1-I.  This is another short clip.

18           (Whereupon, Government's Exhibit No. 1-I was

19   published in open court.)

20           MR. MEINERO:  So Exhibit 1-I was another angle of

21   that assault, your Honor.

22           Exhibit 1-J is a screen shot from that angle.

23   Mr. Neefe is outlined in yellow.  You can see his right hand

24   on the sign frame as the sign is bowing and making contact

25   with the defensive line of officers.  You can also see

1    Mr. Smith right next to him outlined in green.

2              Your Honor, this action of -- this shocking action

3    and participating in it and getting repelled by pepper spray

4    did not deter Mr. Neefe.  After the police line broke at

5    this area, Mr. Neefe advanced forward to the Capitol itself

6    and he entered the Capitol at approximately 2:36 p.m.  He

7    remained inside about 40 minutes.

8              While we did not find evidence that he assaulted

9    officers inside, he disregarded commands from officers to

10   drive a mob out of the Rotunda.  Instead, he tried to make

11   himself an immovable object that would be difficult to

12   dislodge from that area.

13             A screenshot from a body-worn camera video is

14   shown in Exhibit 1-K.  And Exhibit 1-L is the video from the

15   body camera itself, which we have not shown to the Court

16   before.  This is a less-than-90-second clip, your Honor.

17             (Whereupon, segments of Government's Exhibit No.

18   1-L were published in open court.)

19             MR. MEINERO:  I'm going to pause right here.

20   Mr. Neefe can bee seen in the top right quadrant of the

21   video.  Actually, let me play it a little bit more.

22             (Whereupon, segments of Government's Exhibit No.

23   1-L were published in open court.)

24             MR. MEINERO:  Mr. Neefe is on the right side of

25   the video.  His arms are raised above his head.  He's

1    clasping his hands and his elbows are bent.  He's wearing

2    what appears to be a navy sweatshirt.  He was wearing a red

3    plaid jacket before, but he's wearing a navy sweatshirt

4    here.  And you're seeing these officers are trying to drive

5    these rioters out of the Rotunda, but Mr. Neefe is trying

6    his best not to budge.  So he's disregarding their commands

7    to leave.

8              (Whereupon, segments of Government's Exhibit No.

9    1-L were published in open court.)

10             MR. MEINERO:  As I said, just regarding his time

11   in the Capitol, we want to underscore -- that struggle

12   between the officers lasted several minutes.  Eventually,

13   Mr. Neefe did leave the Capitol at approximately 3:17 p.m.

14   So he was inside the Capitol for 40 minutes.

15             And this is an aggravating factor, your Honor.

16   Your Honor has sentenced at least three individuals who were

17   inside the Capitol for ten minutes or less.  I believe it's

18   Anna Morgan-Lloyd, Scott Fairlamb and Frank J. Scavo that

19   were in the Capitol for ten minutes or less.

20             And many others were in there for a matter of

21   minutes.  So a period of 40 minutes inside the Capitol was a

22   significant incursion.  And it's aggravating because every

23   minute Mr. Neefe was inside the building, that was another

24   minute that the certification of the Electoral College vote

25   was delayed.  And that delay caused dismay to millions of

1    Americans and to people all around the world who see the

2    United States as a beacon of democracy.

3              Mr. Neefe and Mr. Smith later left Washington and

4    then Mr. Neefe later posted comments and communicated on

5    Facebook regarding his conduct that day.

6              Part of his communications are depicted in

7    Exhibit 1-N.  Mr. Smith had posted Exhibit 1-M, as in Mary,

8    a picture of Mr. Neefe at the Capitol.  And Mr. Neefe's

9    comments are depicted in Exhibit 1-N.

10             And Mr. Neefe was proud of what he did.  He said:

11   Mace, pepper balls and tear gas, LOL, I'm battle ready,

12   folks.  My skin be spicy.  Literally cannot count how many

13   times I was Maced.  Got a good shot in the mouth, though.

14   Doesn't taste too bad.  Got shot three times with pepper

15   balls and teargassed in the building, LOL.  I was amidst

16   some of the first to make my way in.

17             In Exhibit 1-O, Mr. Neefe continues his

18   conversation on Facebook about his conduct.  He said:  Then

19   we heard the news on Pence and lost it, so we stormed.

20             In Exhibit 1-P, he stated ominously:  It's only

21   going to get more violent.  Today was pussy shit, dude.  If

22   I had it my way, every cop who hurled a baton or Maced on us

23   would be lined up and put down.  We made sure they know we

24   fucking own them.

25             In another communication depicted in

1    Exhibit 1-Q -- and this was also on the night of January

2    6th -- he said:  I'm bringing a gun next time.  IDEC, which

3    is internet lingo for "I don't even care."

4         So the nature and circumstances of the offense are

5    quite serious.

6         And turning to the history and characteristics of

7    Mr. Neefe -- we'll start first with him:  He has no

8    convictions.  That's a factor that would ordinarily militate

9    against a longer period of incarceration.  But Mr. Neefe's

10   characteristics are troubling.  There have been some

11   assertions in the defense submissions that Mr. Neefe has led

12   a peaceful life.

13        And his mother sent in a submission to that

14   effect, which -- you realize this is very difficult for his

15   family.  This is a difficult time for them.  But that

16   assertion should be taken with a grain of salt, because the

17   day after, on January 7th, 2021, on the day after the

18   Capitol siege, Mr. Neefe communicated with his mom by text

19   messages.  He communicated about deleting his social media.

20   He said his smartphone was going to go away next.  His mom

21   replied:  I do hope when you were inside there was no

22   cameras with your face, especially when you are pissing on

23   the stairs or punching up the cop.  So she was aware of some

24   assaultive conduct that happened that day.

25        There's also evidence that -- of dangerous conduct

1    that Mr. Neefe was a user of controlled substances while at

2    the same time possessing firearms.  The Facebook

3    communications contained numerous instances in which he

4    admitted he had used cannabis products.  He also admitted

5    that to the agency post-arrest.  He also facilitated

6    purchase of LSD through Facebook; and in one instance, as

7    depicted in Exhibits 1-T and 1-U, he showed LSD he had

8    acquired.  In Exhibit 1-U, he shows the actual tab of LSD in

9    his mouth while he's taking the LSD, while he dropped that

10   acid.  So that is extremely dangerous conduct.

11          And as the Court noted at the detention hearing,

12   it would have been a violation of the Gun Control Act, 18

13   USC Section 922(g)(3), which prohibits substance abusers

14   from possessing firearms.

15          In addition, we know January 6th was not the only

16   instance in which Mr. Neefe considered bringing a dangerous

17   weapon to a political confrontation.  We went over this

18   during the detention hearing as Exhibit 1-V.  There was a

19   conversation between Mr. Neefe and Mr. Smith on November 11,

20   2020, about going to a different rally, a different Stop the

21   Steal Rally on November 14th, in which Mr. Neefe asks

22   Mr. Smith:  What all is illegal to have on your person

23   there?  Am I allowed to have a knife?  I do have one,

24   though.

25          Mr. Smith said:  I'm bringing a pocketknife.

1          Then Mr. Neefe shared the picture depicted in

2    Exhibit 1-W, and it contained his conversation as depicted

3    in Exhibit 1-X.  He said he was bringing his big boy.  And

4    the picture is the picture of a hunting or military-style

5    knife.  And he said:  If I come into confrontation and I

6    have to use it, my line is I've killed five chickens with

7    this blade.  Let's make it six.  And he said:  I hope I get

8    to smack around a few commies, NGL, which means "not gonna

9    lie."

10         In addition, Mr. Neefe and Mr. Smith shared views,

11   ideations, violent ideations, coupled with extremist

12   beliefs.  In Exhibit 1-Y, Mr. Neefe and Mr. Smith were

13   talking favorably about fascism.  Mr. Neefe said:  I'd

14   rather be a fascist, racist hatemonger than a liar.

15         In Exhibit 1-Z, another part of that same Facebook

16   conversation, Mr. Neefe used rhetoric about how folks need

17   to start getting turned into mist.  They were talking about

18   some incident that was on the internet about a boy in Texas

19   and he used that kind of violent rhetoric.

20         In Exhibit 1-AA and in Exhibit 1-BB, Mr. Neefe

21   shared a picture on Facebook and apparently joked about

22   lynching a black man and said that he wouldn't need a tree

23   to lynch a black man because the rope on his bumper works

24   wonders.

25         In Exhibit 1-CC, another Facebook communication,

1    this was a continuation of talk about the election.

2    Mr. Neefe said:  Looks like McConnell needs a bullet in the

3    head, referring to -- apparently referring to Senator Mitch

4    McConnell.

5            So those extremist views, coupled with the violent

6    rhetoric, is particularly troubling to the Government.

7            As the Court noted at the detention hearing, this

8    kind of violent talk wasn't idle threats, because he

9    actually engaged in violence after this talk when he went to

10   the Capitol -- brought a weapon and assaulted officers.

11           The next factor, the need to reflect the

12   seriousness of the offense and promote respect for the law:

13   Mr. Neefe conspired to obstruct a constitutional and

14   statutory process for certifying the presidential election.

15   In the course of endeavoring to make that conspiracy

16   succeed, he assaulted police officers with a dangerous

17   weapon.  These were harrowingly serious offenses.

18           And we refer back to Exhibit 1-B, the Facebook

19   communication on the night of January 6th, where he made the

20   comment:  If I had it my way, every cop who hurled a baton

21   on Maced one of us would be lined up and put down, and

22   referred to what happened that day as pussy shit.

23           Your Honor, this conduct not only epitomized a

24   lack of respect for the rule of law, but disdain and an

25   evisceration of it.  And that should be accounted for in the

1    sentence.

2          Turning to the next factor, the need to afford

3    adequate deterrence:  We've discussed the need for general

4    deterrence in these cases.  As to specific deterrence, we

5    again refer to the line Mr. Neefe used on the night of

6    January 6th.  He said:  I'm bringing a gun next time.  I

7    don't even care.

8          So there is a pressing need to adequately deter

9    Mr. Neefe specifically.

10          I'll go into some of the mitigating factors here,

11   your Honor.  Mr. Neefe has no adult convictions.  Following

12   his arrest, he gave a voluntary post-arrest interview with

13   the Federal Bureau of Investigation.  He was candid during

14   that interview and he expressed some remorse then, though

15   that was remorse expressed after he was arrested.  Through

16   his counsel, he expressed a desire to accept responsibility

17   early.  Through his counsel, he has also offered to consent

18   to an interview with the Government, but the Government has

19   not asked him to interview.  So he should get credit for

20   those factors.

21          But those are factors that counsel against, in our

22   opinion, a high-end sentence under the guidelines or an

23   upper-range guideline, but certainly not in favor of the

24   downward variance that Mr. Neefe's counsel have urged here.

25          And in light of all the egregious conduct we've

1    laid out, Mr. Neefe deserves the midpoint sentence we had

2    asked for of 46 months.

3          I'll turn to just a couple other defense

4    arguments.  I've addressed some of them during my

5    allocution.  I'll just address a couple more.

6          There's a defense argument that Mr. Neefe was

7    somehow led astray by a toxic friend.  This was also an

8    argument that was raised during the detention hearing.  But

9    we know, your Honor, it was Mr. Neefe who brought a weapon

10   to the Capitol, who took the extraordinary step of

11   fabricating a weapon to bring to the Capitol.  We did not

12   uncover evidence that Mr. Smith brought a weapon to the

13   Capitol grounds.  It was Mr. Neefe who went inside and

14   remained for over 40 minutes in the Capitol, while Mr. Smith

15   did not.

16         And Mr. Neefe did not need arm poles to engage in

17   the conduct he engaged in that day.  So we think that

18   evidence belies the assertion that this is just a matter of

19   a friend holding sway over another friend.

20         And the other defense argument, your Honor, on

21   Page 5 of the defense sentencing memo, the defense argued

22   that Mr. Neefe has never been a person who has been

23   motivated by politicians.  He has never even cast a vote in

24   any election and has not registered to vote.

25         I don't know if the defense is referring to before

1    the time of the election, the 2020 presidential election.

2    Before that, he might not have been involved in politics.

3    But certainly the evidence belies that, that he was quite

4    politically motivated here.  His actions would be taken in

5    furtherance of his support for one candidate and he was

6    prepared to ensure a result that would keep that man in

7    power.  So the evidence belies that.

8            But the larger point is, this isn't about

9    Mr. Neefe's beliefs; it's about his conduct at the Capitol.

10   And his conduct was egregious.

11           To conclude, your Honor, we recommend a sentence

12   of 46 months of incarceration.

13           Let me just ask, your Honor, I had forgotten one

14   thing.  On the issue of unwarranted sentencing disparities,

15   did your Honor want me to address that?

16           THE COURT:  No.  I understand the issues there and

17   I have seen the chart you all prepared.

18           MR. MEINERO:  Very well, sir.  So I'll conclude.

19           We ask for a sentence of 46 months of

20   incarceration followed by three years of supervised release

21   and $2,000 restitution to the Architect of the Capitol,

22   which was negotiated in the plea agreement, and the

23   mandatory $100 special assessment for each count of

24   conviction.

25           This within-guideline sentence would be warranted

1    under each of the 3553(a) factors, would vindicate the

2    officer victims in this case and would vindicate perhaps the

3    most vulnerable victim in all of these Capitol cases, our

4    democratic system of government.

5            Thank you.

6            THE COURT:  Thank you very much.

7            Ms. Lee?

8            MS. LEE:  Thank you, your Honor.

9            In United States versus Charles Bradford Smith,

10   also known as Brad Smith -- we'll refer to him as Brad; we

11   understand that that is his preferred moniker through his

12   counsel -- the Government is requesting a 44-month sentence,

13   three years of supervised release and the $2,000 of

14   restitution to the Architect of the Capitol.

15           We will also go through the sentencing factors,

16   keeping an eye on the time, of course, your Honor, briefly.

17   We'll start with the nature and circumstances of the offense

18   under 18 USC 3553(a)(1).

19           Mr. Smith and Mr. Neefe, as Mr. Meinero indicated,

20   engaged in extensive preplanning before this event.  The

21   defense argues in their memo that they only began planning a

22   few days before January 6th.  But that is belied by their

23   Facebook communications.  In this message occurring on

24   November 4th of 2020, Mr. Smith indicated:  We all deep down

25   knew this was how the election was going to go.  Now if

1   Trump wins, the riots will be 50 times worse.

2            Mr. Neefe indicated:  Hope it burns either way.

3            Smith responded:  Me, too.  This country needs to

4   split up immediately.

5            Neefe replied:  Why shouldn't we be the ones to

6   kick it off?

7            This is back in November of 2020 as the election

8   results were coming in.  This is Exhibit A-1.

9            They continued this planning through December.  In

10  Exhibit 1-B, Mr. Neefe said:  IDEK, which is internet slang

11  for "I don't even know," what's gonna happen with this

12  election shit RN, which is "right now."

13           Smith replied:  The call to action was put out to

14  be in D.C. on January 6th from the Don himself.  The reason

15  it's that day, the day Pence counts them up; and if the

16  entire city is full of Trump supporters, it will stop the

17  for-sure riots from burning down the city at least for a

18  while.

19           Neefe replied:  We going?  Because hot damn, son,

20  I really wanna crack some commie skulls.

21           This communication continued, this planning

22  throughout December.  This message is from December 31st.

23           Mr. Smith indicated:  I can't wait for D.C.

24  Apparently, it's going to be way bigger, LOL.  If it's big

25  enough, we should all just storm the buildings.  Seriously,

1    I was talking to my dad about how easy that would be with

2    enough people.

3            Mr. Smith wrote to another Facebook user in

4    order -- asking him to come to the Capitol with him to

5    recruit further participants:  Take off the 6th, man.  It's

6    the big one.  Trump is literally calling people to D.C. in a

7    show of force.  Militias will be there; and if there's

8    enough people, they may fucking storm the buildings and take

9    out the trash right there.

10           The other user responded:  Are you going down?

11           Smith replied:  Hell, yeah.

12           These images here Mr. Smith posted of himself and

13   Marshall.  The first image is from his Facebook on January

14   6.  He indicates:  Sweet taste of teargas.  Fuck 12.  We

15   literally stormed the Capitol.  Mission accomplished, boys.

16           And 12 corresponds to an internet slang for police

17   officers.

18           As Mr. Meinero mentioned, Mr. Smith and Mr. Neefe

19   as they approached the Capitol cemented their conspiracy to

20   obstruct the official proceeding.  Indeed, in a video Smith

21   recorded, which I'll play at 1-G, Mr. Smith and Mr. Neefe

22   approached the grounds and Mr. Smith said:  We have stormed

23   the Capitol.  What's up, Marshall?

24           And Marshall replies affirmatively with a nod.

25           I'll play this video.  It's 1-G.

1          (Whereupon, Government's Exhibit No. 1-G was

2     published in open court.)

3          MS. LEE:   In another video Mr. Smith took on the

4     grounds as they reached the line of officers at 1-H, you can

5     see how close Mr. Neefe and Mr. Smith were to the line that

6     they ultimately breached.

7          (Whereupon, Government's Exhibit No. 1-H was

8     published in open court.)

9          MS. LEE:   Smith shared further videos of his

10    actions at the grounds.  As he and Mr. Neefe approached the

11    police line, first they engaged in attempting to breach the

12    line through just physically shoving forward until prior to

13    the sign assault.

14          Mr. Smith shared 1-I with the caption:   This is

15    what happens to you when you're up front.

16          (Whereupon, Government's Exhibit No. 1-I was

17    published in open court.)

18          MS. LEE:   Smith further recorded additional video

19    of his participation in illegal conduct on the grounds.

20    This video was taken approximately ten minutes prior to the

21    sign assault at around 1:30 p.m.

22          (Whereupon, Government's Exhibit No. 1-J was

23    published in open court.)

24          MS. LEE:   For the record, that's Exhibit 1-J.

25          In another video, Mr. Smith recorded approximately

1    two minutes prior to the sign assault at 1:38 p.m.  Other

2    rioters had begun to pull bike racks away from the line of

3    officers attempting to breach the line.  Mr. Smith yelled in

4    assent to this action.

5                (Whereupon, Government's Exhibit No. 1-K was

6    published in open court.)

7                MS. LEE:  I won't play these videos again, your

8    Honor, but these are the videos previously played in

9    Mr. Neefe's PowerPoint where the Defendants both

10   participated in the sign assault.  This sign, as mentioned,

11   was massive.  It was fully metal with casters that an

12   officer described as being as large as a man's head.  It

13   took 15 officers to later dispose of the sign after it was

14   thrust into their line.

15               Again, here is a screenshot of that video with

16   Mr. Smith outlined in green with both of his hands on the

17   sign frame as it is being thrust into the line of officers,

18   utilized as a battering ram.  Mr. Neefe is outlined in

19   yellow with one hand on the sign at the time.

20               Exhibit 1-O is a further screenshot in a

21   sequential timespan in the same video, which shows after the

22   sign is thrust forward Mr. Smith had been pepper sprayed by

23   officers in the line.  And you can see him squinting as he

24   backs away from the assault.

25               In Exhibit 1-P, a few seconds later, Mr. Smith

1    regroups at the back of the crowd and films the sign

2    continuing to be thrust into the officers, manifesting his

3    assent to the action and documenting this moment for

4    posterity.

5             Mr. Smith extensively shared his participation in

6    the Capitol riot on Facebook.  And he indicated in this

7    video, 1-Q, which I'll play:  Here's guys holding the door

8    closed so we could storm it before reinforcements came out

9    the door to gas us.  Here's us holding the cops in the

10   building, not letting them get reinforcements to fuck us.

11   They suck, LOL.  Here's one keeping reinforcements from

12   coming out that door and holding the door shut so

13   reinforcements can't get in while people move closer.

14             This video was taken on the west plaza after the

15   line had been breached by Mr. Smith and Mr. Neefe.

16             Mr. Neefe at this point had proceeded up the

17   stairs and was making his way into the Capitol while

18   Mr. Smith stayed on the ground and encouraged rioters here

19   to force the door closed so that officers could not respond

20   to the continued threat to the Capitol that was ongoing.

21             (Whereupon, Government's Exhibit No. 1-Q was

22   published in open court.)

23             MS. LEE:  After Mr. Smith and Mr. Neefe left the

24   grounds, they communicated with triumph about their

25   participation in the illegal actions of that day.  In

1    Exhibit 1-R, Smith stated:  Got gassed so many times.  Shit

2    is spicy but the adrenaline high and wanting to get Pelosi

3    and those fucks.  It was bearable.

4            In Exhibit S, he indicated:  We literally did it.

5    We stormed the bitch.  Marshall even went in a room and

6    pissed.  No bathrooms, so....  We were front row, getting

7    teargassed and hit/pushed.  Made the child fucking

8    politicians evacuate and escape out the tunnels underground.

9    Some of those dudes would have hung 'em right there [sic]

10   they found 'em.  I can't even explain how unbelievable that

11   just was.  If I would have known what I do now, I don't

12   think I would have the balls.  But no turning back when one

13   million people are behind you pushing.

14           These messages belie Mr. Smith's assertion that he

15   was remorseful immediately about his conduct at the Capitol.

16   In fact, he was celebratory and braggadocious on Facebook to

17   his friends and trusted comrades.

18           Mr. Smith further wrote the night of January 6th:

19   Stormed the place.  My friend Marshall went inside and took

20   a piss on the floor of a small room.  They didn't have

21   anywhere to piss, so fuck them.

22           Yeah.  I think we should have went even harder.

23   Too bad nobody found any of the politicians in the building.

24   BTW, which is "by the way," that was Marshall dumping water

25   on that dude's eyes in case you didn't know.  He was my ride

1    and I wasn't sure if he was gonna make it back, LOL.

2              In Exhibit 1-V, Mr. Smith further elucidates his

3    intent:  It went great, though.  They had to evacuate those

4    faggots.  The looks on their faces, ha-ha-ha-ha, indicating

5    congressional staff and members who were made to evacuate

6    the building.

7              Mr. Smith further indicated in Exhibit 1-X:  It

8    was beautiful and will happen again.  Glad to be in the

9    front row.  And he posted a meme, which is 1-X-1, which

10   states:  I'll fucking do it again.

11             Later, Mr. Smith said:  Oh, yeah.  The time will

12   come for some of them -- indicating politicians -- but

13   today's mission was successful.  Remember how they said

14   today was the final day and that Biden would be certified?

15   Well, we literally chased them out into hiding.  No

16   certification, LOL.

17             Pence cucked like we knew he would, but that was

18   an unbelievable show of force and it did its job.  That's in

19   Exhibit 1-Y.

20             Then Mr. Smith indicated:  Who knows what's going

21   to happen?  We need more violent uprisings, he says, the

22   prices like this.  It's the only language they speak.  And

23   he amends the "prices" to "uprisings."  It's Exhibit 1-Z.

24             Finally, Mr. Smith indicated:  It's nice seeing

25   everybody unify in hating Mitch McConnell and the

1    Republicans and Nancy Pelosi, the Dems.  Maybe we can all

2    join up and skin them alive, showing his violent and

3    extremist rhetoric and ideations.

4            In the hours following the riot, Mr. Smith texted

5    Mr. Neefe the below.  Mr. Smith said:  My parents know what

6    you were wearing and they didn't see shit either.  If

7    everything goes fine, the next time we got to be more

8    prepared.  Goggles, gas masks and padding.  After it was

9    over, I just head back Goofy meme in my head, the "I'll

10   fucking do it again," LOL, indicating again that Mr. Smith

11   was not remorseful, but rather planning further violent

12   action against the political individuals and the

13   certification of the Electoral College.

14           On the evening of January 6th, Mr. Neefe -- we

15   went through these communications here.  And Mr. Smith

16   responded to this message in 1-C:  That whole thing was a

17   trip.  It's hard to process how badass that was.

18           That was his final summary and cap on the night:

19   It was bad ass and he thought there should be more violent

20   uprisings.

21           Turning to the history and characteristics of the

22   Defendant:  Like Mr. Neefe, Mr. Smith does not have any

23   criminal history, which usually would warrant a lesser

24   sentence.  However, like Mr. Neefe, Mr. Smith has

25   significant prior contact with illicit substances as well as

1    weapons.  And there's evidence in his Facebook communication

2    of violent ideation and extreme extremist rhetoric.  I won't

3    read these again.  We discussed them in Mr. Neefe's.  But

4    Mr. Smith was well aware that you could bring weapons to --

5    or at least knives to D.C., because he indicates here back

6    in November of 2020 that he's bringing a pocketknife to a

7    rally in D.C. and in fact he's had pocketknives there

8    before.

9           This again -- both Mr. Neefe and Mr. Smith discuss

10   fascism in a favorable light.  And Mr. Smith goes so far as

11   to minimize the danger and violence of fascism by saying:

12   It's culture, heritage, family history, tradition.  And

13   nobody hates a communist more than a fascist, LOL.

14          Mr. Neefe had shared this photograph of himself

15   using LSD and Mr. Smith responded to this in December of

16   2020:  It's all good, LOL.  I literally do it every day.

17          Mr. Smith also indicated to Pretrial Services his

18   use of cannabis and cannabis products as well as cocaine

19   prior to his conduct at the Capitol and cocaine use actually

20   while he was on supervision as well.

21          Further, during this time, Mr. Smith had

22   possession of firearms.  Here, he shares a photograph of a

23   firearm on December 24th of 2020 and indicates:  I need a

24   shoulder strap now for a gun, in Exhibit 1-HH.

25          The need to reflect the seriousness of the offense

1    and promote respect for the law:  Here, we'll just go back

2    to Exhibit 1-CC.  Mr. Smith's capstone comment on the event

3    was:  The whole thing was a trip.  It's hard to process how

4    badass that was.

5              That was the night of January 6th, after the world

6    had reacted in horror to this event, after the news had

7    splashed the terror and the complete unprecedented violence

8    at the Capitol.  Mr. Smith responded:  How badass that was.

9              The need to afford adequate deterrence:  We'll

10    return to Exhibit 1-X and Exhibit 1-X1.  Mr. Smith

11    commented:  It was beautiful and will happen again.  It will

12    happen again.

13              It's important to assess both general and specific

14    deterrence.  Here, we're discussing specific deterrence.

15    Mr. Smith had no problem indicating he would wish for

16    further violence and further actions like the riot on the

17    Capitol.

18              The same night, he said:  We need more violent

19    uprisings like this, in Exhibit 1-Z.  So in particular,

20    there is specific deterrence warranted for Mr. Smith in this

21    case.

22              Like my colleague, I won't go through the table,

23    as your Honor has indicated that you already have reviewed

24    it.  I will just note the Government is requesting a

25    44-month sentence for Mr. Smith and a 46-month sentence for

1    Mr. Neefe.

2              First, I'll go through the mitigating factors for

3    Mr. Smith:  He did agree to a custodial interview after his

4    arrest in which he was largely candid.  He left out his

5    participation in the sign assault, but later indicated that

6    was because he was surprised and out of his element in the

7    FBI interview.

8              He also agreed ultimately to debrief with the

9    Government and was largely candid.  He did attempt to

10   minimize much of his conduct in the sign assault, but was

11   otherwise forthcoming.

12             Mr. Smith also did not enter the Capitol Building.

13   He participated in additional what we believe is egregious

14   conduct in urging other rioters to continue to confront

15   police and having no issue with that conflict at the

16   violence around him, but he didn't go into the building

17   itself.

18             Further, although he discussed bringing a weapon

19   to the Capitol, a knife specifically, the Government did not

20   find any evidence that Mr. Smith ultimately brought that

21   weapon onto the grounds, whereas his Co-Defendant did.

22             We don't believe these mitigating factors militate

23   a downward departure, however, due to Mr. Smith's other

24   egregious conduct, including his extensive replanning with

25   Mr. Neefe, his conduct -- his assaultive conduct on the

33

1     grounds and also his violent and extremist rhetoric.

2           However, we do believe that these factors warrant

3     a mid-range sentence.  And we are requesting a slightly

4     shorter sentence for Mr. Smith versus Mr. Neefe due to

5     Mr. Neefe's egregious additional conduct, specifically the

6     aggravating factor of fabricating a weapon and bringing it

7     onto the grounds as well as taking the egregious step of

8     entering the Capitol and staying within the Capitol for 40

9     minutes.  That is more egregious and serious conduct and

10    does warrant a longer sentence.

11          Because of all of the factors we discussed, your

12    Honor, we believe a 44-month sentence is appropriate

13    followed by three years of supervised release as well as the

14    $2,000 restitution to the Architect of the Capitol and the

15    $100 special assessment that is mandatory for each count of

16    the conviction.

17          Thank you, your Honor.

18          THE COURT:  I'll hear first, then, from Mr. Boyle.

19          MR. BOYLE:  Thank you, your Honor.

20          My client would like to make a statement.  Should

21    that occur after allocution by counsel?

22          THE COURT:  Sure.  He can do it first or last.

23    Either way.

24          MR. BOYLE:  I'll ask Mr. Neefe to go first, if

25    that's okay.

1          DEFENDANT NEEFE:  During my incarceration, I have

2     received many letters and postcards with similar messages

3     inscribed stating I am a hero and a patriot.

4          I must say I strongly disagree and dissuade any

5     such notion.  Heroes and patriots do not do or say the

6     things that I have said and done.  They respect our nation's

7     laws and elections.  I'm an incredibly ignorant 26-year-old

8     who followed the former president's rhetoric surrounding the

9     elections lies, and in doing so I broke the law.

10          I fully acknowledge my wrongdoings.  I understand

11    if I choose the behavior I also have chosen the consequences

12    that follow.

13          With that being said, to all the men and women in

14    the line of duty that day, those who were actively defending

15    our nation's Capitol, those who I harmed and prevented from

16    doing so, I am deeply remorseful and sorry for what I have

17    done.

18          To all the men and women inside of the Senate

19    chambers conducting the count of the electoral votes for the

20    most sacred proceeding to our nation, those whom I through

21    my abhorrent actions prevented from doing so, to you, I

22    apologize.  I apologize for the stain that will forever be

23    left on this nation's history.  I now know the baseless

24    conspiracies touted by our former president and surrounding

25    politicians were completely and unequivocally false.

1          I may not have voted, but my actions and conduct
2     were not justified, had I or hadn't I.
3          They were wrong.  And if I could go back, I would
4     have gone to work instead of D.C.
5          To my family, I love and miss you all dearly.  I
6     am going to spend a lifetime making up for the love and
7     support you have given me through all the hell that I have
8     caused you in this.  You raised me better than this.  You
9     raised me to respect beliefs and law.  You raised me to
10    choose right, not wrong.  You raised me to help, not hurt.
11    I have let you down.  I have let myself down.  Even more so,
12    I let down my son.
13         Through my actions, I alone have removed myself
14    from my son's life.  I alone have set a horrible example,
15    one I will spend the rest of my life striving to come back
16    from.
17         I want nothing more than to continue to be the
18    hardworking, loving provider for the one that I work so hard
19    for.  And I will ensure that none of my actions in the
20    future prevent me from doing that.  I will do better.
21         To the various agencies, to the prosecution and to
22    the Honorable Royce C. Lamberth, your time and efforts to
23    the community and to society are essential to our nation.  I
24    am sorry your time had to be used on such an ill-informed,
25    ignorant and quite frankly stupid individual as myself.

1          I know better, was raised better and will commit

2    my life to do better than what I've shown to you in this

3    Court.  I will respect what judgment you pass on to me, your

4    Honor.  I acknowledge my inexcusable actions and am deeply,

5    truly filled with remorse.  I can only ask for mercy in your

6    decision.

7          Thank you for allowing me to speak in your court.

8          MR. BOYLE:  May it please the Court:

9          There are evil and malevolent forces at work in

10   our country, evil men around the world from Moscow to

11   Mar-a-Lago who would destroy this great country.  The United

12   States stands as a firm bulkhead against authoritarianism

13   and totalitarianism internationally and as a shining example

14   of the power of democracy in every country.

15          But this democratic ideal threatens the existence

16   of totalitarian regimes that fear the power of democracy in

17   their own countries.  The rule of law that flows from these

18   democratic ideals and our Constitution threaten those who

19   engage in criminal conduct, including the former president

20   and high-ranking officials in this country.

21          The very concept of the United States presents an

22   existential threat to these evils.

23          If we are to understand what happened on January

24   6th, if we are to understand the Government's video in

25   context -- and the Government's presentation was a fair and

1   accurate representation of what happened -- but if we are to

2   put it in context, then it's necessary to confront an evil

3   truth about January 6th:  The truth is that it was

4   orchestrated by people at the very highest levels of the

5   U.S. Government, people like the former president,

6   malevolent actors in Congress and within the Department of

7   Justice and other federal agencies.

8           Even to this day, we hear our elected

9   representative senators and representatives perpetuate a

10  false narrative that nothing bad happened on January 6th,

11  that it was no different than any other protest.  We know

12  this is false, but the poison continues to spread through

13  the body politic of this nation.

14          The flames of hatred and division that sparked the

15  attack were fanned by leaders and the media, who continue to

16  fan those same flames of hatred.  They refer to Marshall

17  Neefe as a political prisoner or as a patriot or as a hero.

18          When I first met Marshall nearly a year ago, even

19  at that time, he hung his head in shame as he acknowledged

20  what he did and how wrong it was.

21          Marshall knows that these characterizations of him

22  and others at the Capitol were a lie.  His life has been

23  changed forever because he believed the lies he heard.  He

24  will face the consequence of this action, of his actions,

25  actions that were motivated by the lies of others, for the

1    rest of his life.

2         He has already suffered severely.  He's lost his

3    longtime girlfriend, his family.  His relationship with his

4    son has been impacted.  He's lost the house that he lived in

5    and the job and the steady way of living that he had.

6         As Edward Buhler Lytton wrote two centuries ago,

7    the pen is mightier than the sword.  And that's what I think

8    of in this case.  I think that quote is often used to

9    reflect the sentiment that truth is expressed and the pen

10   will overcome violence.

11        It was actually from the play *Richelieu*, however.

12   The words uttered by Cardinal Richelieu in the play

13   expressed his belief that words can be used to manipulate

14   people and to cause violence.  And that's what happened in

15   this case.

16        That is what we see now:  Leaders in the media use

17   written words to undermine the truth and to mobilize people,

18   often good people, to take actions they never would have

19   otherwise taken on their own.

20        Prior to January 6th, these media stars, an armory

21   of radio talk show personalities and podcasters who profit

22   from chaos and disorder, beat a steady drumbeat, a drumbeat

23   that still can be heard across this country today:

24   "President Trump won the election.  The election was stolen.

25   There was massive voter fraud."

1            These are all lies, and the people that perpetuate

2       them at the highest levels know they're lies.  The people

3       who hear these lies on TV and radio and over the internet,

4       however, don't know they're lies.  They believe or in many

5       cases believed that they were the truth.  For the most part,

6       these folks are good people.  But they're unsophisticated

7       and not highly educated.  They never learned of concepts

8       like confirmation bias.  They had always been taught to be

9       respectful of authority; and to them, unfortunately, that

10      authority was Donald Trump.  And if they did have any

11      question about Trump's authority and whether what Trump said

12      was true, the Trump propaganda machine and its associated

13      grifters and sycophants were there to reinforce the lie.

14            To use a Napoleonic war analogy, people like

15      Marshall Neefe are like the people who were in the front

16      lines of combat.  They marched forward as their generals

17      watched from telescopes far away.  They suffered the enemy's

18      musket balls and cannon fire, and in the end they died.

19      They were merely cannon fodder.  The people who watched from

20      afar from a safe distance would quickly abandon them if they

21      lost or swoop in to take credit if they won.

22            And that's the way it still is, your Honor.  So

23      who bears greater responsibility:  the people who

24      orchestrate the attack on the Capitol, people like Steve

25      Bannon, who called on people to come to the Capitol, people

1   like Rudy Giuliani, who called for trial by combat, people

2   like Donald Trump, who said they needed to fight like hell,

3   or people like Marshall Neefe, who, more idiot than

4   criminal, believed the lies he was told?

5           I would suggest, your Honor, the answer is

6   obvious.  But as with battles, it's people like Marshall

7   Neefe that are going to suffer the most.

8           The evil forces are still out there no matter how

9   much time Mr. Neefe spends in prison.  After the search of

10  the former president's residence in Mar-a-Lago, a man from

11  Ohio attempted to enter an FBI office in Cincinnati and was

12  ultimately killed and paid a heavy price.  But the people

13  who sent the false message continue to call for violence.

14          All this is not to suggest, your Honor, that

15  people who believed the great lies of the former president

16  and his minions and have committed illegal action not be

17  punished.  Marshall committed illegal acts.  He said vile

18  things on the internet.  He responded voluntarily to the

19  lies of evil men.

20          But as the Government shows in this video, his

21  attack, his involvement with the sign, lasted less than ten

22  seconds.  He entered the Capitol.  He admitted he was wrong.

23  But he did not engage in acts of violence in the Capitol.

24  When it was over, after some unfortunate comments, he went

25  back to try and to lead a law-abiding life.  Even before the

1    FBI had shown up, he realized what he did was wrong.

2           Life for Marshall Neefe was based on religion,

3    family and hard work.  He had no understanding of or

4    interest in politics.  In fact, he has never been registered

5    to vote and continues not to be registered to vote.

6           He was interested in his son, his parents, his

7    family and his God.  He has no criminal record.  And as the

8    character references demonstrate, he is liked and respected

9    by his employer and his co-workers.

10          We would submit, your Honor, that there is no risk

11   of recidivism.  Since he has been arrested, Marshall Neefe

12   has come to terms with his drug addiction or with his drug

13   use.  He's already served 12 months in the less-than-ideal

14   conditions of the D.C. city jail.

15          He's been separated from his family and friends.

16   He's already been punished severely for what happened on

17   January 6th.

18          In an ideal word world, your Honor, we would ask

19   that Marshall Neefe be treated no more harshly than those

20   that instigated, planned and encouraged the attack on the

21   Capitol at the highest level, that his sentence be no

22   greater than that of those who profited from the attack at

23   the Capitol.

24          We know that's not possible.  In the world in

25   which we live, these individuals will continue to spread

1    anarchy with impunity.  Only people like Marshall Neefe will

2    be punished.

3              We would ask your Honor to consider these factors,

4    specifically Marshall Neefe's prior record of no criminal

5    conduct, his offers to cooperate with the Government

6    afterwards, his acknowledgement and very sincere belief that

7    everything that he did was a lie.

8              We would ask the Court to fashion a punishment

9    that is sufficient to serve the ends of justice.

10             Thank you, your Honor.

11             THE COURT:  Thank you very much, Mr. Boyle.  Very

12   nicely done.

13             Mr. Cooper?

14             MR. COOPER:  Thank you, your Honor.

15             Your Honor, may I seek leave of the Court with

16   permission of the courtroom clerk while I'm at the podium to

17   remove my mask to address the Court while I'm speaking?

18             THE COURT:  Yes.

19             MR. COOPER:  Thank you, your Honor.  I greatly

20   appreciate that.

21             Your Honor, I'm not going to waste the Court's

22   time repeating the -- some of the factors that I put in my

23   sentencing memorandum.  I just would like to touch on a few

24   items that were raised here today by the Government.

25             I first of all would like the Court to be aware

1    that here in the courtroom today, Mr. Smith does have his

2    family present to support him, his mother, his father and

3    his sister.

4           THE COURT:  I will say, I was very impressed by

5    their letters and the support they provided.

6           MR. COOPER:  Yes.  Thank you, your Honor.  I think

7    they were very much in earnest and honest and hope.  Thank

8    you, your Honor.

9           I think the first thing I'd like to say is, it is

10   clear, I think, in this day and age that there are people

11   out there who instigated or organized or had much more

12   malevolent intent on January 6th than people that are here

13   today.  But we're not here for those people today.  I'm here

14   for Brad Smith.  And it's Brad Smith that I'm going to focus

15   my attentions upon.

16          We don't disagree, Brad doesn't agree, with the

17   characterizations that the Government made with respect to

18   the events of January 6th.  I referenced in the memorandum

19   the attack on the republic and the attack on our seat of

20   government and how it doesn't matter how much the people out

21   there that day, Brad included, chanted "USA, USA."  This

22   actually was an attack on the Constitution of this country,

23   this government and this people.  And for that, Brad is

24   sorry and Brad is embarrassed.

25          With respect to embarrassment:  It's been clear

1    from at least the time I've known Mr. Smith, which is almost

2    about a year ago -- I think he first came in in September of

3    last year -- the embarrassment that he felt when he was

4    confronted with the materials the Government provided in

5    discovery, the materials he recorded, the materials he sent

6    out on Facebook, that he was -- well, to say that he

7    regretted it would be a huge understatement.  And it's been

8    terribly difficult for him to sit here today with his family

9    in the courtroom in a U.S. courtroom watching those images

10   again and reliving that day again.

11           And he gets to relive his regret again here today

12   in front of the Court and in front of the country.

13           There are a couple of things, though, that I would

14   stress are different here with respect to Mr. Smith.  I'm

15   going to try and do this without referring to Mr. Smith's

16   Co-Defendant.

17           But it is true that Mr. Smith did not bring a

18   weapon to the Capitol grounds that day.  Whether or not he

19   brought one to D.C. is immaterial.  The fact that -- even if

20   he did, the fact that he did not bring it to the Capitol

21   Building I think should be taken into huge account.

22           The second thing is, there is discussion about

23   Mr. Smith characterizing his participation that day as

24   storming the Capitol.  He mentioned -- uses those words

25   himself in one of his videos.  But the fact of the matter is

1        this, your Honor:  He did not enter the building.  At some

2        point, he made that decision to stop and to turn around and

3        to walk away.  And that can be characterized in very many

4        different ways by the Government or by any commentator.

5               By the fact of the matter is that those are his

6        actions.  By those actions, he showed that even with all the

7        intent in the world that he came to D.C., whatever that was,

8        at some point enough was enough.  And he was unwilling to

9        cross that Rubicon, that event horizon, and go into the

10       building.  And he didn't.  And I think the Court should take

11       that into account.

12              With respect to any of the -- how people were

13       incited that day to come to Washington, D.C., and to the

14       Capitol Building, all that is true.  But Brad is not walking

15       back what he did.  Yeah.  He heard those lies.  He did.  And

16       yes, he acted upon them.  The fact of the matter is, he did

17       act upon them.  He did come to the Capitol Building to -- in

18       response to Donald Trump.

19              In fact, the Government made mention in its

20       presentation that -- I know I talked about that it was only

21       in the days leading up to the January 6th riot that Brad

22       made specific plans to come to D.C.  And in its

23       presentation, the Government showed some Facebook and some

24       text messages in which that happened.

25              But I'll note with the Court that those text

1    messages were mostly on the 31st of December, which is

2    essentially the week before the January 6th events, and were

3    in response to a specific tweet from the former president

4    for people to come to D.C.

5            So I guess the point I'm trying to make is, this

6    hadn't been a long-planned -- when I mean "planned," I mean

7    specific plans like:  We're going.  Yeah.  They talked about

8    different things up to that point.  But it was not until the

9    actual tweet from the president came out, the former

10   president, that Brad and his friends responded.

11           I think the fact of not bringing a weapon to the

12   Capitol Building and not entering the Capitol Building

13   itself -- and I stress, I say this not with respect to the

14   Government's allocution for Mr. Smith's Co-Defendant, their

15   recommendation for a sentence, but the difference between

16   their recommendation is two months.  It's 44 for Brad.  And

17   I think that there is more than a two-month difference in

18   the discrepancy in the actions here.

19           And so I am going to ask the Court to consider,

20   based on Mr. Smith's regret, based on his acceptance of his

21   responsibilities here, his full acceptance, based on his

22   position of -- irrespective of what people may have said in

23   the past, that he still owns up to his own actions and takes

24   responsibility for them, and based on that he has no

25   criminal history, I am going to ask the Court here to

```
1     consider a downward departure from the 41 months.

2            I will note that from the time of -- when this

3     case first came in, that Mr. Smith was placed on home

4     detention.  He has been in the same status for the whole

5     length of this case and has been remarkably squeaky clean on

6     supervision.  I think he's shown to this Court that he has

7     respect for the courts, that he has respect for court

8     orders; and as I noted in my memorandum, that he has respect

9     for law enforcement, especially given his charitable

10    contributions to police funds since then.

11           Putting it simply, your Honor, this is a young man

12    who came down to D.C. as a child, made childish decisions

13    based on what other people said; but through this process he

14    has owned up to his actions and what he did that day as a

15    man.  He owns them now and he asks this Court for leniency

16    in sentencing him.

17           And I believe Mr. Smith would care to address the

18    Court briefly, if the Court would permit.

19           THE COURT:  I will.

20           MR. COOPER:  Thank you, your Honor.

21           THE COURT:  Thank you, Mr. Cooper.

22           DEFENDANT SMITH:  Thank you for letting me speak,

23    your Honor.

24           THE COURT:  Certainly.

25           DEFENDANT SMITH:  I don't know how to really put
```

1    this.  I didn't have anything prepared.  But this whole

2    thing has been a huge embarrassment to myself and my family

3    and to so many people I know.

4           And as being raised as a Christian, I was taught

5    not to idol worship.  And I knew that.  I knew not to

6    worship idols.  And I did that with Donald Trump anyway, and

7    look where it got me.  It really destroyed my life and it

8    hurt a lot of people that I know and my family's lives.  And

9    I just want to move forward and get all this over with and

10   be a contributing member of society.

11          I just want to apologize to the Capitol Police;

12   and to not just them, but the nation and to the world and

13   all the nations that look up as a shining city on a hill,

14   country.  Yeah.  I'm so sorry.

15          Thank you for letting me speak, your Honor.

16   That's all I have to say.

17          THE COURT:  Okay.  Give me just a moment.  I will

18   have to take a short recess for this other matter.  It'll be

19   just a few minutes before we can proceed.  The Court will be

20   in a short recess.

21          (Thereupon a recess was taken, after which the

22   following proceedings were had:)

23          THE COURTROOM DEPUTY:  Your Honor, resuming

24   Criminal Case 21-567, the United States of America versus

25   Marshall Neefe and Charles Bradford Smith.

```
1            THE COURT:  Could I have both Defendants come to
2    the podium.
3            THE DEFENDANTS:  (Comply.)
4            THE COURT:  I will tell you up front so you don't
5    have the suspense, I have carefully considered the
6    Sentencing Commission guidelines as well as the arguments of
7    counsel and the statements of both of you today.
8            These are difficult cases for the Court.  The
9    seriousness of the offense, the preplanning of both of you
10   in connection with, here, the assaultive conduct make it a
11   case in which the Court has an obligation to recognize the
12   seriousness of the events.
13           At the same time, I have a hard time in these
14   cases because I've had Defendants that I have believed and
15   thought that they had a sincere statement at the time of
16   sentencing about how they made a mistake and how they had
17   changed their minds, and then they went on Fox News the next
18   day and said the opposite things they said to me at the time
19   of sentencing.  And it's very hard to figure out -- you
20   know, at the time of sentencing I find many Defendants have
21   suddenly discovered God and all sorts of other things happen
22   at sentencing.  It's hard for judges to really figure out
23   who's being truthful.
24           I will tell you up front, I believe both of you.
25   I believe both of you have sincerely recognized that you did
```

1   wrong here.  I believe both of you sincerely believe what

2   you said to me today.  I believe both of you have made a

3   terrible mistake, and I believe both of you think what you

4   told me today.  I hope that's true.

5          I'm going to take it into account in your

6   sentencing, because I'm going to say that you both have

7   supportive family members that have told me that, that have

8   corroborated that you recognize your mistakes.  And I think

9   that both of you are young.  Both of you have shown --

10  you've never been in trouble.  You've lived good lives and

11  you have the opportunity to still live good lives.

12         But what happened to our country as a result of

13  this incident is something that demands a sentence at the

14  bottom of the guidelines.  I don't agree with the Government

15  that I have to give you more than the bottom of the

16  guidelines.  So I am going to end up going with the minimum

17  end of the guidelines.

18         But I don't think I can justify a sentence below

19  the guidelines since I think actually both of you provided a

20  good example of someone who's trying to decide what to do

21  once you figure out that what you did was wrong.  You both

22  looked at it at every angle.  You've got good lawyers to

23  advise you.  You've looked at what your exposure would be if

24  you go to trial.  You've got the best deal you could have

25  out of the Government.

1    You've persuaded me to give you the minimum of the

2    guidelines.  There are hundreds of other young people like

3    you who have been charged in this case now.  We've got like

4    800 of these, and many of them are still pending, trying to

5    decide what to do.  You set a good example for them,

6    actually, as being among the first to come forward and just

7    take your medicine and recognize that you just need to get

8    on with your lives and take what you can get and you got the

9    best deal you could get and you've got to get on with your

10   life.

11   I wish you the best.  I know you don't like what

12   is coming out of this.  I don't think you could have done

13   better.  I will say to you, as I would say to others who are

14   in your same position, I think you've done the best you

15   could.  And I think what you said today demonstrates that

16   you recognize that as well.  And I hope you were sincere

17   today because, if you were and you are, you're going to come

18   out of this better for the whole thing than you otherwise

19   would have been.

20   I recognize both of your attorneys made a good

21   presentation on your behalf.  And I have to sentence you

22   individually.  But I'm going with a minimum guidelines

23   sentence in each of your cases.

24   So pursuant to the Sentencing Reform Act of 1984

25   and in consideration of the provisions of 18 USC Section

1    3553 as well as the advisory sentencing guidelines, it is

2    the judgment of the Court that you, Charles Smith -- Brad,

3    otherwise known as -- are hereby committed to the custody of

4    the Bureau of Prisons for a term of 41 months on Counts 1

5    and 4 to run concurrently.

6           You are further sentenced to serve a 36-month term

7    of supervised release on Counts 1 and 4 to run concurrently.

8    In addition, you are ordered to pay a special assessment of

9    $100 on each of Counts 1 and 4 for a total of $200 in

10   accordance with 18 USC Section 3013.

11          I'll come back and read you the provisions on

12   supervision and special conditions in a minute and other

13   conditions.

14          As to the Defendant Neefe, let me read you the

15   opening:  Pursuant to the Sentencing Reform Act of 1984 and

16   in consideration of the provisions of 18 USC Section 3553,

17   as well as the advisory sentencing guidelines, it is the

18   judgment of the Court that you, Marshall Neefe, are hereby

19   committed to the custody of the Bureau of Prisons for

20   concurrent terms of 41 months on Counts 1 and 4 and further

21   sentenced to serve concurrent terms of 36 months' supervised

22   release on Counts 1 and 4.  In addition, you are ordered to

23   pay a special assessment of $100 on each count for a total

24   of $200 on both counts in accordance with 18 USC Section

25   3013.

1            Now, as to both Defendants:  Following
2      supervision, you shall abide by the following mandatory
3      conditions as well as the standard conditions of
4      supervision, which were imposed to establish the basic
5      expectations for your conduct while on supervision:
6            The mandatory conditions include:  One, you must
7      not commit another federal, state or local crime.  Two, you
8      must not unlawfully possess a controlled substance.  Three,
9      you must refrain from any unlawful use of a controlled
10     substance.  You must submit to one drug test within 15 days
11     of placement on supervision and at least two periodic drug
12     tests thereafter as determined by the Court.  Four, you must
13     cooperate in the collection of DNA as directed by the
14     probation officer.  And you must make restitution in
15     accordance with 18 USC Section 3663 and 3663A or any other
16     statute authorizing a sentence of restitution.
17            As to both Defendants, you shall comply with the
18     follow special conditions:
19            One, you must submit to substance abuse testing to
20     determine if you've used a prohibited substance.  You must
21     not attempt to obstruct or tamper with the testing methods.
22     Two, you must participate in an inpatient and/or outpatient
23     substance abuse treatment program and follow the rules and
24     regulations of that program.  The probation officer will
25     supervise your participation in the program, provider,

1   location, modality, duration and intensity, et cetera.  And,

2   three, within 60 days of release from incarceration or

3   placement on supervision, you will appear before the Court

4   for a reentry progress hearing.  Prior to the hearing, the

5   probation officer will submit a report summarizing your

6   status and compliance with release conditions.

7          If you're supervised by a district outside of the

8   Washington, D.C., Metropolitan area, the probation officer

9   for the district where you're supervised will submit a

10  progress report to the Court within 60 days of the

11  commencement of supervision.  Upon receipt of the progress

12  report, the Court will determine if your appearance is

13  required.

14         As to both Defendants, the Court finds you do not

15  have the ability to pay a fine, and therefore waives

16  imposition of a fine in this case.

17         As to each Defendant, both Mr. Smith and

18  Mr. Neefe, you are ordered to pay restitution to the

19  Architect of the Capitol, Office of the Chief Financial

20  Officer, in the amount of each of you of $2,000 each.  The

21  Court determines you do not have the ability to pay a fine

22  or interest -- or pay interest, and therefore waives any

23  interest penalties that may accrue on the balance of the

24  restitution.  So you will only pay the total amount of

25  restitution of $2,000.

1          Restitution payments shall be made to the Clerk of

2     the Court, U.S. District Court for the District of Columbia,

3     for disbursement to the following victim:  the Architect of

4     the Capitol in the amount of $2,000, addressed to the Office

5     of the Chief Financial Officer, Attention:  Cathy Sheryl,

6     CPA, Forward Council Building, Room H-2205B, Washington,

7     D.C. 20515.

8          The financial obligations of restitution are

9     immediately payable to the Clerk of the Court, U.S. District

10    Court, 333 Constitution Avenue, Northwest.

11         Within 30 days of any change of address, you shall

12    notify the Clerk of the Court of the change until such time

13    as the financial obligation is paid in full.

14         As to each of you, you will have an obligation of

15    restitution to pay the balance of any restitution owed at

16    the rate of no less than $50 each month and provide

17    verification of the same to the probation office.

18         The probation office shall release the presentence

19    investigation report to all appropriate agencies, which

20    includes the United States Probation Office in the approved

21    district of residence, in order to execute the sentence of

22    the Court.  Treatment agencies shall return the presentence

23    report to the probation office upon the Defendant's

24    completion or termination from treatment.

25         I also find that neither of you have the financial

1    ability to pay a fine, and therefore the Court waives

2    imposition of a fine based on your requirement to pay

3    restitution in the case.

4            Now, pursuant to 18 USC Section 3742, each of you

5    have a right to appeal the sentence imposed by the Court if

6    the period of imprisonment is longer than the statutory

7    maximum or the sentence imposed departs upward from the

8    sentencing guidelines.  And if you do choose to appeal, you

9    must file your appeal within 14 days after I enter this

10   judgment.

11           As defined in 28 USC Section 2255, you also may

12   have the right to challenge the conviction entered or

13   sentence imposed if new or currently unavailable information

14   becomes available to you or on a claim that you received

15   ineffective assistance of counsel in entering your plea of

16   guilty to the offense of conviction or in connection with

17   sentencing.

18           If you are unable to afford the cost of an appeal,

19   you may request permission from the Court to file an appeal

20   without any cost to you.

21           Pursuant to the D.C. Circuit opinion in *U.S.*

22   *versus Hunter*, does counsel have any objections to the

23   sentence as imposed that aren't already noted on the record?

24   Mr. Cooper or Mr. Boyle?

25           MR. BOYLE:  No objections on behalf of Mr. Neefe.

```
1              MR. COOPER:  No, your Honor.

2              I do have --

3              THE COURT:  Mr. Cooper, I assume I'll allow your

4     client to self-surrender when a sentencing determination --

5     when a place of confinement is determined since he's been

6     out now.  There's no reason for him not to unless you have

7     some other recommendation to make.

8              MR. COOPER:  No, your Honor.  Thank you, your

9     Honor.

10             I did inquire of the U.S. -- of the Government,

11    and they would not object to my requesting such.

12             THE COURT:  Okay.  Now, I need a motion from the

13    United States regarding remaining charges.

14             MR. MEINERO:  Yes, your Honor.

15             The United States pursuant to the plea agreement

16    moves to dismiss Counts 2 and 3 and Counts 5 through 14 of

17    the superseding indictment as to Mr. Neefe and Mr. Smith.

18             THE COURT:  So ordered.

19             Anything else counsel needs to raise today?

20             MR. MEINERO:  No, your Honor.

21             MR. BOYLE:  Your Honor, Dennis Boyle on behalf of

22    Mr. Neefe.

23             Would the Court consider recommending a facility?

24    We would request Fort Dix, New Jersey, since that is near

25    the Defendant's residence.
```

```
 1              THE COURT:  I will.  I'll make that recommendation
 2     in the J&C when I have it prepared.
 3              MR. BOYLE:  Thank you, your Honor.
 4              THE COURT:  I guess as to the Defendant Smith, I
 5     can make a recommendation now, even though he's not yet been
 6     designated.
 7              Do you want me to make a recommendation?
 8              MR. COOPER:  Yes, your Honor.  I think the closest
 9     facility is actually Allentown.
10              THE COURT:  Okay.
11              MR. COOPER:  Thank you.
12              THE COURT:  And Fort Dix is still better for
13     Mr. Neefe?
14              MR. BOYLE:  Yes, it is, your Honor.
15              THE COURT:  I'll make those recommendations as
16     well.
17              Anything further?
18              Let me say to each Defendant one other thing.
19     Mr. Smith, if you can come back forward.
20              You guys are young.  You've got a future.  I don't
21     want to see you guys again.  I want to see you do well.
22     Best of the luck to you.
23              DEFENDANT NEEFE:  Thank you, your Honor.  You
24     won't see us again.
25              THE COURT:  Court will be in recess.
```

1              MR. MEINERO:  Thank you, your Honor.

2              (Proceedings concluded.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              **<u>CERTIFICATE</u>**

2

3                    I, LISA EDWARDS, RDR, CRR, do hereby

4        certify that the foregoing constitutes a true and accurate

5        transcript of my stenographic notes, and is a full, true,

6        and complete transcript of the proceedings produced to the

7        best of my ability.

8

9

10                   Dated this 19th day of October, 2022.

11

12                   <u>/s/ Lisa Edwards, RDR, CRR</u>
                     Official Court Reporter
13                   United States District Court for the
                       District of Columbia
14                   333 Constitution Avenue, Northwest
                     Washington, D.C. 20001
15                   (202) 354-3269

16

17

18

19

20

21

22

23

24

25